UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

CLEVELAND DIVISION

| | | |
|---|---|---|
| CORT CORWIN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 1:19-cv-02115 |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | CLASS ACTION |
| VIEWRAY, INC., SCOTT DRAKE, AJAY BANSAL and JAMES F. DEMPSEY, | ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) | |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)
murray@mmmb.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  631/367-7100
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
michaelf@johnsonfistel.com

Plaintiff, Cort Corwin ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by ViewRay, Inc. ("ViewRay" or the "Company"), Company press releases and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of ViewRay common stock between March 15, 2019 and August 8, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.      Defendant ViewRay designs, manufactures, and markets radiation therapy systems sold in the United States and internationally in-house and through distributors.

3.      Throughout the Class Period, defendants issued materially false and misleading statements that failed to disclose adverse facts concerning the Company's business, operations and financial results.  Specifically:

(a)      that demand for ViewRay systems had declined due in part to changes being made to Medicare reimbursement approaches first announced in November 2019 that could make purchases of new ViewRay systems less profitable for customers;

(b)      that the Company's reported backlog was overstated due to the inclusion of orders with insufficient surety as to permit for their inclusion in reported backlog; and

(c)     that as a result of the foregoing, defendants' positive statements about ViewRay's business metrics and financial prospects during the Class Period were materially false and misleading and/or lacked a reasonable basis.

4.      On August 8, 2019, after the close of trading, ViewRay disclosed operational issues and slashed its previously-issued full fiscal year 2019 ("FY19") financial guidance.

5.      In response to this news, the price of ViewRay common stock price declined by more than 50%, or $3.64 per share, to close down at $3.10 per share on August 9, 2019, on unusually high trading volume of more than 26.6 million shares trading, or nearly 16x the average volume over the preceding ten trading days.

6.      As a result of defendants' wrongful acts and omissions as alleged herein, Plaintiff and the Class (as defined below) purchased ViewRay commons stock at artificially inflated prices, suffered significant losses and were damaged thereby.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the 1934 Act.

9.      Venue is proper in this District pursuant to Section 27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District where ViewRay is headquartered.

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications and the facilities of the NASDAQ here in this District.

## PARTIES

11.     Plaintiff Cort Corwin, as set forth in the accompanying certification which is incorporated herein by reference, purchased ViewRay common stock during the Class Period and was damaged thereby.

12.     Defendant ViewRay is headquartered in Oakwood Village, Ohio.  ViewRay common stock trades on the NASDAQ under the ticker symbol "VRAY" and as of August 1, 2019, there were more than 98.48 million shares issued and outstanding.

13.     Defendant Scott Drake ("Drake") is, and at all relevant times has been, the President and Chief Executive Officer ("CEO") of ViewRay and a member of its Board of Directors.

14.     Defendant Ajay Bansal ("Bansal") was, and at all relevant times, the Chief Financial Officer ("CFO") of ViewRay.  Defendant Bansal's resignation was announced August 9, 2019.

15.     Defendant James F. Dempsey ("Dempsey") is, and was at all relevant times, a founder and the Chief Scientific Officer of ViewRay.

16.     Defendants Drake, Bansal and Dempsey are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of ViewRay common stock during the Class Period.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of ViewRay's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their

access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

17.    Defendant ViewRay and the Individual Defendants are sometimes referred to herein collectively as the "Defendants."

18.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about ViewRay.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ViewRay common stock was a success, as it: (i) deceived the investing public regarding ViewRay's prospects and business; (ii) artificially inflated the price of ViewRay common stock; (iii) permitted defendant Dempsey to sell some of his personally-held shares at fraud-inflated prices; and (iv) caused Plaintiff and other members of the Class to purchase ViewRay common stock at artificially inflated prices.

**SUBSTANTIVE ALLEGATIONS**

19.    Defendant ViewRay designs, manufactures, and markets the MRIdian radiation therapy system, which employs MRI-based technology to provide real-time imaging that differentiates the targeted tumor from the surrounding soft tissue and other critical organs during radiation treatment.

20.    ViewRay specializes in the development of MRI-guided radiation therapy ("MRgRT") technology for the treatment of cancer.  The Company's MRIdian became the first MRgRT system on the market following FDA approval of its Cobalt-60 powered device in 2012, with its next-gen MRIdian linac following in 2017.  MRIdian combines MRI and external-beam

radiation therapy to simultaneously image and treat cancer patients, which it claims overcomes many of the shortcomings of traditional radiotherapy.

21.     ViewRay competes against Varian Medical Systems, Elekta and Accuray, all companies that have an established installed base and significant resources.  In December 2018, Elekta announced that its own MRI Linac that already had a CE Mark had obtained FDA approval. ViewRay's $6+ million price for its MRIdian is higher than that which its bigger competitors can offer.

22.     In July 2018, ViewRay underwent a massive turnover in management.  Defendant Drake was brought in as President and CEO, replacing the outgoing Chris A. Raanes who had been President and CEO since February 2013, and Shar Matin was made Chief Operating Officer ("COO"), replacing Doug Keare who had served as COO since April 2015.  Both Drake and D. Keith Grossman had been added to the ViewRay Board.  ViewRay's July 24, 2018 press release highlighted that Drake and Martin had previously worked together as executives at Spectranetics Corp. ("Spectranetics"), a developer and manufacturer of minimally invasive cardiovascular devices, which it said in August 2017 had been acquired for $2.2 billion by Royal Philips.  The release quoted Daniel Moore, Chairman of the ViewRay Board, stating that Drake and Matin had "deep operational experience with fast-growing medical companies [that would] be invaluable" to ViewRay.

23.     It typically takes nine to twelve months for a ViewRay customer to prepare its facility to receive a new system after the purchase contract is executed (referred to as "vault readiness"). Installation then takes an additional sixty to seventy-five days.  ViewRay purportedly does not recognize revenue on any of its contracts until the system is installed.  Because the average time from contract to revenue recognition had historically been at least a year, and more often upwards of eighteen months, Drake and his new management team had substantial visibility into delays into

installations, and thus the timing of recognition of revenue and related costs, related to the orders in backlog.  One of defendant Drake's first orders of business would be to create a new "vault readiness" team to help customers speed up the process between contract signing and revenue recognition.

24.     In November 2018, U.S. Health & Human Services ("HHS") Secretary Alex M. Azar II identified so-called value-based transformation, including new physician payment models, as one of his administration's top priorities.  One of the most highlighted proposals was for a radiation oncology-alternative payment model ("APM").  Adoption of an APM was desired by HHS to stabilize medical costs, drive adherence to nationally recognized clinical guidelines and improve patient care in cancer treatment by rewarding providers for outcomes rather than high volumes of treatment.  Though Defendants would claim throughout the Class Period that an APM, once implemented, would be beneficial to ViewRay because MRIdian would compete well under the new pricing model, because anticipated implementation of an APM threatened to reduce the large windfalls shared by cancer treatment providers, its threatened adoption began weighing on ViewRay's sales efforts.

25.     The Class Period starts on March 15, 2019.  On March 14, 2019, after the close of trading, ViewRay issued a press release announcing its fourth quarter and full fiscal year 2018 ("FY18") financial results for the period ended December 31, 2018, and provided FY19 guidance.  For FY18, ViewRay reported total revenues of $81 million on the sale of 13 systems and 2 system upgrades, compared to FY17 revenues of just $34 million on the sale of just 6 systems.  ViewRay stated that during FY18 it had received 23 new orders for MRIdian systems totaling $140.7 million, up from 19 new orders totaling $113.6 million in FY17.  It stated that its total backlog increased to $212.3 million as of December 31, 2018, up from $203.6 million as of December 31, 2017.  The release quoted Defendant Drake stating that ViewRay had "made significant progress on [its]

commercial, innovation and clinical pipelines" and that during FY19, it was "well positioned to drive further growth, therapy adoption and extend [its] innovation lead."  As for guidance, the release stated that "[f]or the full year 2019, ViewRay anticipates total revenue to be in the range of $111 - $124 million, and total cash usage to be in the range of $65 - $75 million."

26.    ViewRay conducted a conference call with investors and stock analysts later that afternoon providing additional positive statements about the Company's then-present business metrics and financial prospects.  Specifically, during his opening remarks defendant Drake stated in pertinent part as follows:

> [O]n the operational front, we're making significant progress. The majority of our vault readiness team is in place, and we are actively engaging with every customer to prepare for installation and shorten the overall time frame from purchase order to revenue recognition and first patient treated. ***We are experiencing shorter PO to rev rec time frames and expect continued progress.***

> \*     \*     \*

> ***We are smoothing and speeding the path from PO to first patient treated. . . .***

27.    During the conference call, defendant Bansal went on to emphasize that "[d]riven by a greater number of installs and operational efficiencies, [ViewRay was] expect[ing] to see improvement in gross margins in 2019," which he characterized as "a step in [the] journey [to] drive stronger gross margin improvement beyond 2019" – which investors interpreted to mean that ViewRay was well on its way to profitability.  He also commented upon backlog, stating in pertinent part as follows:

> Let me now turn to orders and backlog. In the fourth quarter of 2018, we received 8 new orders from MRIdian Systems totaling approximately $49 million compared to 6 orders totaling $34 million for the same period last year. For the full year 2018, we received 23 new orders, totaling approximately $141 million, up from 19 new orders, totaling $114 million in 2017.

> At year-end 2018, our backlog stood at approximately $212 million compared to $204 million at year-end 2017. In the fourth quarter of 2018, we removed 3 systems from our backlog. ***While we'll continue to review the backlog each quarter, our recent thorough review is now complete.***

28.    Towards the end of the conference call, defendant Drake engaged in the following colloquy with a stock analyst directly questioning him on how backlog could be growing at a faster rate than installations if the backlog was in fact accurate, responding in pertinent part as follows:

**Andrew Jacob D'Silva, B. Riley FBR, Inc., Research Division - Senior Analyst**

. . . . You were mentioning the PO to rev rec shortening and how you focus on that. I'm just curious, when you start looking at your backlog, you kind of do back of the envelope, it's several times more than what you could actually install in any given year, and it's growing faster than actual installs year-over-year could, at this point, at least.  So I'm curious, at what point -- how many times your annual install rate do you see the backlog new orders kind of tapering down?  I assume most customers wouldn't want to be in the backlog for 3 or 4 years, it's probably more of a 1- to 2-year process for them, I'd at least expect based on my due diligence.  What are your takes on that?

**Scott William Drake, ViewRay, Inc. - President, CEO & Director**

Yes, I think that's right. I mean, my goal is to get to the point where we're installing systems at the speed that our customers desire.  And I would say that, historically, kind of us not proactively engaging from a vault readiness standpoint was probably the biggest reason for that average of 18 months from PO to rev rec versus where we're heading, which we think is roughly 12 months.  Now there is going to be some variability from one customer to another.  The way we're looking at it, which is, I think, consistent with kind of industry norms, is that 80% of our purchase orders would convert to revenue in roughly that 12 month period of time.  There are some customers that have asked us to get in queue.  And they really want to move faster, and so we're considering those versus others who might be willing to be more patient.  So there's not a hard and fast there, but ***I do think you will see that time frame come down as we have indicated before***.

29.    On March 15, 2019, ViewRay filed its FY18 annual financial report on Form 10-K with the SEC which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by all three Individual Defendants (the "FY18 10-K").  As to the calculation of "backlog," the FY18 10-K stated in pertinent part ViewRay "perform[ed] a quarterly review of backlog to verify that outstanding orders in backlog remain[ed] valid, and based upon this review, orders that [were] no longer expected to result in revenue [were] removed from backlog," adding that it "decide[d] whether to remove or add back an order from or to [its] backlog by evaluating the following criteria: changes in customer or distributor plans or financial conditions; the customer's or distributor's continued intent

and ability to fulfill the order contract; changes to regulatory requirements; the status of regulatory approval required in the customer's jurisdiction, if any; and other reasons for potential cancellation of order contracts."

30.     On May 2, 2019, after the close of trading, ViewRay issued a press release announcing its first quarter 2019 ("1Q19") results for the interim period ended March 31, 2019.  In addition to reporting having "[r]eceived 7 new orders for MRIdian systems totaling $42.8 million, compared to 3 orders totaling $21.2 million in the first quarter of 2018," and 1Q19 "[t]otal revenue of $20.3 million, primarily from 3 revenue units and 1 system upgrade, compared to $26.2 million, primarily from 4 revenue units and 1 system upgrade, in the first quarter of 2018," ViewRay reported that its "[t]otal backlog increased to $237.5 million as of March 31, 2019, from $212.3 million as of December 31, 2018."  The release quoted Defendant Drake stating that the 1Q19 results were "a solid start to the year and reflect progress on [the Company's] commercial, innovation, and clinical pipelines," emphasizing that ViewPay was "well-positioned to execute in 2019."  As to guidance, the release stated that ViewPay was "reiterating its financial guidance for the full year 2019," confirming the Company still "anticipate[d] 2019 total revenue to be in the range of $111 million to $124 million, and total cash usage to be in the range of $65-$75 million."

31.     ViewRay conducted a conference call with investors and stock analysts later that afternoon providing additional positive statements about the Company's then-present business metrics and financial prospects.  Defendant Drake opened his remarks stating in pertinent part as follows:

> This was our second full quarter with the company.  I would describe it as solid and another meaningful step in the right direction.  We are progressing through the operational improvements of the business and closing out historical commitments, while concurrently building our commercial engine, ***our sales pipeline is growing as anticipated***, and resulted in 7 orders this quarter.

32.     "Turning [] to orders and backlog," defendant Bansal stated in pertinent part that ViewRay had "received seven new orders from MRIdian Systems totaling approximately $43 million compared to 3 orders, totaling approximately $21 million for the same period last year," that "[a]s of March 31, 2019 [the] backlog stood at approximately $238 million compared to approximately $212 million at year-end 2018," and that "*[t]here were no orders removed from the backlog this quarter*."

33.     On May 3, 2019, ViewRay filed its first quarter financial report on Form 10-Q with the SEC, which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Drake and Bansal (the "1Q19 10-Q").  As to the calculation of "backlog," the 1Q19 10-Q again stated in pertinent part ViewRay "perform[ed] a quarterly review of backlog to verify that outstanding orders in backlog remain[ed] valid, and based upon this review, orders that [were] no longer expected to result in revenue [were] removed from backlog," adding that it "decide[d] whether to remove or add back an order from or to [its] backlog by evaluating the following criteria: changes in customer or distributor plans or financial conditions; the customer's or distributor's continued intent and ability to fulfill the order contract; changes to regulatory requirements; the status of regulatory approval required in the customer's jurisdiction, if any; and other reasons for potential cancellation of order contracts."

34.     On July 1, 2019, Defendant Dempsey sold 5,146 of his personally-held shares of ViewRay common stock for $8.63 each, reaping more than $44,000 in gross proceeds.  The sales were unusual as to timing as he had not sold any shares since March 2018.

35.     On July 10, 2019, CMS announced its long-anticipated APM proposal.  CMS proposed to kick off a five-year demonstration project in select geographic areas starting in either January or April 2020.  The proposed model would bundle all radiation therapy payments into a 90-day episode, with reimbursement split between professional and technical components.  The

program would span 17 different types of cancer that are commonly treated with radiation therapy (including brain, breast, cervical, colorectal, liver, lung, pancreatic, and prostate) and be mandatory for both hospitals and freestanding clinics located within selected geographic areas.  Payment levels would be fixed for each cancer type.  Under the proposed 90-day episode of care model, both hospitals and freestanding radiation oncology clinics would be incentivized to maximize patient throughput while minimizing complications, rather than the current structure, which rewards maximizing the number of fractions therapy is delivered in.

36.     On July 16, 2019, ViewRay disclosed that on July 15, 2019 a member of the ViewRay Board of Directors had resigned effective immediately.

37.     On August 1, 2019, Defendant Dempsey sold another 21,615 of his personally-held shares of ViewRay common stock for $8.97 each, reaping nearly $194,000 in gross proceeds.

38.     The statements referenced above in ¶¶25-35 were materially false and misleading when made because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them as follows:

(a)     that demand for ViewRay systems had declined due in part to changes being made to Medicare reimbursement approaches first announced in November 2019 that could make purchases of new ViewRay systems less profitable for customers;

(b)     that the Company's reported backlog was overstated due to the inclusion of orders with insufficient surety as to permit for their inclusion in reported backlog; and

(c)     as a result of the foregoing, Defendants' positive statements during the Class Period about its business metrics and financial prospects were false and misleading and/or lacked a reasonable basis.

39.     On August 8, 2019, after the close of trading, ViewRay issued a press release announcing its 2Q19 results and updating its FY19 guidance.  For the 2Q19, ViewRay reported a net

loss of $30.8 million, or $0.32 per share, much worse than the net loss of $0.23 per share ViewRay had led the market to expect. ViewRay also reported 2Q19 MRIdian orders of only $18.1 million, down considerably from the $34.6 million in new orders that were booked in the 2Q18 and well below the $42 million the Company had led investors to expect based on their bullish Class Period statements. Reported backlog declined sequentially to $219.3 million. Adding insult to injury, ViewRay cut its FY19 revenue guidance to between $80-million and $95-million (12-15 systems), well below the $111-million to $124-million (17-19 systems) guidance it had provided on March 14, 2019 and maintained on May 2, 2019. Total cash use for FY19 was now expected to be in the range of $80 million to $90 million, up considerably from the prior range of $65 million to $75 million, exponentially increasing losses and delaying the progression to profitability. Defendants also disclosed that the employment of CFO Defendant Bansal would be terminated effective September 30, 2019.

40. During the conference call held later that afternoon with investors and stock analysts, ViewRay disclosed that four system installations had been pushed from 2019 to 2020, blaming the delays on issues in the planning and permitting process for the customers, and uncertainty around the timing of two additional distributor orders. The Company attributed the decrease in system orders in 2Q19 to: (1) 2Q19 being the first full quarter the Company's new U.S. sales team was in their territories; (2) HHS proposing the new APM model which they now admitted had caused customers to delay purchasing new systems; and (3) competitive dynamics. Regarding the issue of the distributor timing uncertainty, ViewRay disclosed that they were seeking alternative distributors for international sales moving forward to ensure the fulfillment of orders moving forward.

41. ViewRay reported a 2Q19 ending backlog balance of $219 million, which had declined by $18 million quarter-over-quarter. The decline reflected: (i) ~$28 million decline due to system placements; (ii) +$18 million from new orders received; and (iii) ~$8 million decline in

adjusting backlog/expired orders. Emphasizing that 2Q19 was the first full quarter for the Company's new U.S. sales team is in their new territories, ViewRay stated that it now felt more confident in the quality of the remaining pipeline/backlog going forward.

42. On this news, the price of ViewRay common stock declined by more than 50%, or $3.64 per share, to close down at $3.10 per share on August 9, 2019, on unusually high trading volume of more than 26.6 million shares trading, or nearly 16x the average volume over the preceding ten trading days. Analysts slashed their price targets on ViewRay common stock across the board citing concerns with the business metrics and financial prospects and questioning the quality of the reported backlog, including among others:

- Morgan Stanley who cut their price target from $7 to $5 per share citing "commercial execution" and "profitability headwinds and potentially structural concerns."

- Guggenheim who cut their price target from $12 to $8 per share, noting that "2Q was a disappointing update as ViewRay booked just 3 new system orders for $18.1M (-48% YOY) after averaging $48M in orders over the prior two quarters," while emphasizing that "[t]he more concerning number, in our view, is the slowdown in new orders as this represents the best proxy for where the business will be from a revenue perspective in 12-18 months."

- Northland Capital Markets who slashed its price target by 75% from the $20 per share set just July 30, 2019 down to just $5 per share stating "heightened execution risk is real" and that as such, the firm was "removing [its] foot off the gas pedal." Northland Capital Markets specifically called out the recent "bulk order win at GenesisCare by Elekta," stating that "[e]ven if Elekta had to give massive discounts to entice the bulk order, that would imply that Elekta is ready to play hardball in terms of pricing, which we contend ViewRay lacks," adding that "[t]hat, in and of itself, introduces a new level of complexity in market analyses."

- BTIG who slashed its price target from $10 to $6 per share stating "[o]rder weakness in Q2 was chalked up to lumpiness, the new U.S. sales team still early in their tenure (first full quarter in their territories), and potentially some minor delays as customers assess the recently proposed Radiation Oncology Alternative Payment Model (APM)."

- Jefferies who slashed its price target in half from $14 to $7 per share, emphasizing that "[a]ll that could go wrong went wrong in 2Q: orders fell short @ 3 (JEF 8), top-line guidance was slashed $30mn at midpoint on slower installs in turn driving cash burn $15mn higher at midpoint; to boot the co also announced resignation of CFO in the coming weeks."

- Cantor Fitzgerald who cut it price target by more than 50% from $13 down to $6 per share, stating that "weak orders, install delays and increased expected cash burn naturally raise concerns."  It further warned that "MRIdian has an ASP of $6MM, which is a significant capital expense for a hospital. Therefore, any changes in economic conditions could lead a facility to postpone installation or delay a purchase. Furthermore, the majority of linear accelerator purchases are to replace an older system, and a facility may choose to extend the life of an existing system rather than purchase a new system in trying economic conditions."

43.     As a result of Defendants' wrongful acts and omissions, Plaintiff and the Class purchased ViewRay common stock at artificially inflated prices, suffered significant losses and were damaged thereby.

## ADDITIONAL SCIENTER ALLEGATIONS

44.     As alleged herein, ViewRay and the Individual Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding ViewRay, their control over, and/or receipt and/or modification of ViewRay's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning ViewRay, participated in the fraudulent scheme alleged herein.

45.     With the price of ViewRay common stock artificially inflated on these false but positive statements, founder and CSO defendant Dempsey cashed in, selling his personally-held shares at fraud-inflated prices on July 1st and August 1st.

46.     Moreover, each of the Defendants was motivated to overstate the true demand for MRIdian, sales growth and the quality of the Company's backlog in order to bolster perception in the

market for cancer treatments as to the adoption of MRIdian as the standard of care, in particular when compared to demand for Elektra – its new market competitor.

## NO SAFE HARBOR

47. The "Safe Harbor" warnings accompanying ViewRay's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

48. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of ViewRay who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION AND ECONOMIC LOSS

49. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of ViewRay common stock and operated as a fraud or deceit on purchasers of ViewRay common stock. As detailed above, when the truth about ViewRay's misconduct was revealed, the value of ViewRay's common stock declined precipitously as the prior artificial inflation no longer propped up the common stock price. The decline in the price of ViewRay common stock was the direct result of the nature and extent of

defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price decline negate any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of ViewRay common stock and the subsequent significant decline in the value of ViewRay common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

50.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of ViewRay's business, operations and financial results as alleged herein.  Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of ViewRay common stock to be artificially inflated.  Plaintiff and other Class members purchased ViewRay common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE

51.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

52.     Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for

ViewRay stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)     ViewRay stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient market;

(b)     ViewRay regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     ViewRay was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

53.     As a result of the foregoing, the market for ViewRay stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all those who transacted in ViewRay stock during the Class Period suffered similar injury through their transactions in ViewRay stock at artificially inflated prices and a presumption of reliance applies.

54.     Without knowledge of the misrepresented or omitted material facts, Plaintiff and other Class members purchased or acquired ViewRay stock between the time Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for ViewRay stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action on behalf of all purchasers of ViewRay common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest.

56.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ViewRay common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by ViewRay or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.   Joinder would be highly impracticable.

57.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

58.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c) whether the prices of ViewRay common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(d) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

60. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I

**For Violation of Section 10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

61. Plaintiff incorporates ¶¶1-60 by reference.

62. During the Class Period, Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63. Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of ViewRay common stock during the Class Period.

64.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ViewRay common stock.  Plaintiff and the Class would not have purchased ViewRay common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

65.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of ViewRay common stock during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the 1934 Act
### Against All Defendants

66.    Plaintiff incorporates ¶¶1-65 by reference.

67.    During the Class Period, Defendants acted as controlling persons of ViewRay within the meaning of Section 20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about ViewRay, the Individual Defendants had the power and ability to control the actions of ViewRay and its employees.  ViewRay controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Prays for judgment as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding Plaintiff and the members of the Class damages and interest;

C.      Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 12, 2019                     MURRAY MURPHY MOUL + BASIL LLP
                                               JOSEPH F. MURRAY


                                               **/s/ Joseph F. Murray**
                                               JOSEPH F. MURRAY (0063373)
                                               1114 Dublin Road
                                               Columbus, OH 43215
                                               Telephone: 614/488-0400
                                               614/488-0401 (fax)
                                               murray@mmmb.com

                                               ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
                                               SAMUEL H. RUDMAN
                                               MARY K. BLASY
                                               58 South Service Road, Suite 200
                                               Melville, NY 11747
                                               Telephone:  631/367-7100
                                               srudman@rgrdlaw.com
                                               mblasy@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
michaelf@johnsonfistel.com

*Attorneys for Plaintiff*

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Cort Corwin, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 3/25/2019 | 500 | 8.21 |
|  |  |  |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
|  |  |  |
|  |  |  |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 6th day of September 2019.

DocuSigned by:

*CORT CORWIN*

193738BA1DFF4D8...

CORT CORWIN