**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION (CLEVELAND)**

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT ASSOCIATION, Individually and on Behalf of All Others Similarly Situated,<br><br>           Plaintiff,<br><br>   vs.<br><br>VIEWRAY, INC., SCOTT DRAKE, AJAY BANSAL, JAMES F. DEMPSEY, CHRIS A. RAANES, and SHAHRIAR MATIN,<br><br>           Defendants. | No. 1:19-cv-02115-JG<br><br>Hon. James S. Gwin<br><br><u>CLASS ACTION</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

**SECOND AMENDED COMPLAINT FOR VIOLATION OF**
**<u>THE FEDERAL SECURITIES LAWS</u>**

Lead Plaintiff Plymouth County Retirement Association ("Plymouth" or "Plaintiff"), by and through its attorneys, and on behalf of all others similarly situated, alleges the following upon information and belief, except as to those allegations concerning Plymouth, which are alleged upon personal knowledge.  Plaintiff's information and belief are based on, among other things, its counsel's investigation, which includes, without limitation: (a) a review and analysis of regulatory filings made by ViewRay, Inc. ("ViewRay" or the "Company"); (b) a review and analysis of press releases and media reports disseminated by the Company; (c) a review of other publicly available information concerning Defendants (defined below); and (d) interviews with former employees of the Company.

## NATURE OF THE ACTION

1.      This is a securities class action brought to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities that purchased or otherwise acquired ViewRay common stock between May 10, 2018 and January 13, 2020, inclusive (the "Class Period"), and who were damaged thereby.

2.      Defendant ViewRay is a medical device manufacturer.  It went public on July 23, 2015, through a reverse merger and private placement offering.  Since that time, ViewRay has experienced high expenditures, significantly lower revenue, and a constant need for cash to keep its operations going.  ViewRay's sole product is a capital-intensive system known as MRIdian, which uses radiation therapy and magnetic resonance imaging ("MRI") to image and treat cancerous tumors.

3.      This action arises from a fraudulent scheme perpetrated by Defendants, which involved the manipulation of a key measure of the Company's success, namely its backlog.

Backlog is the accumulation of all orders for which ViewRay has not recognized revenue and that ViewRay considers "valid."  ViewRay represented to investors that it had strict criteria that an order needed to meet in order to be deemed a "valid" backlog order.  Specifically, for a transaction to be included in the backlog, ViewRay purportedly required an outstanding and effective written agreement for the delivery of a MRIdian system signed by an end-user customer **and**, subject to certain limited exceptions, a deposit or letter of credit.  Further, ViewRay purportedly updated its backlog when its customers' plans changed.

4.     In an effort to comfort investors over its poor revenue generation and inability to operate at a profit, the Company emphasized its significant backlog as the true marker of the Company's success.  According to Defendants, the backlog was the Company's "most important metric."  Furthermore, given the purported criteria imposed by ViewRay, the backlog provided comfort that the Company had a locked stream of significant revenue forthcoming.  At the same time, ViewRay's backlog increased quickly and substantially in the quarters before the Class Period and maintained that elevated level during the Class Period.

5.     Contrary to Defendants' representations, the Company frequently did not follow its stated criteria for including orders in the backlog.  As a result, ViewRay's backlog was inflated with "invalid" orders that were far softer than valid orders that complied with the Company's stated criteria.  The Company's backlog practices diverged from representations in three important respects:

(a)     For the international market, which accounted for two-thirds of backlog and sales, purported orders that Defendants counted in the Company's backlog were invalid because they were made by third-party distributors and lacked end-user customers

2

contracts.  As such, these non-compliant orders represented a significantly softer revenue prospect than an order that complied with ViewRay's stated backlog criteria;

(b)     Related to the first point, on information and belief, the backlog contained "orders" that were placed by ViewRay's distributor network at the behest of the Company in order to bulk up its backlog and that did not have identified end-user customers; and

(c)     Third, orders were kept in backlog despite evidence that they were no longer valid.  For example, the backlog included stale orders that had not moved for years.  The backlog also included orders where the client had stated it did not want to proceed with the sale.

6.     Throughout the Class Period, Defendants also claimed that ViewRay had approximately $200 million in its backlog, a significant amount indicating that the Company had concrete prospects to grow its revenue in the near term.  These statements were false and misleading because the value of the backlog was inflated by invalid contracts.

7.     In addition to Defendants' numerous misstatements concerning the criteria, reliability, and value of the backlog, Defendants also misled investors concerning ViewRay's FY19[1] revenue.  In March 2019, Defendants issued a press release stating that "[t]otal backlog increased to $212.3 million as of December 31, 2018, up from $203.6 million as of December 31, 2017."  The press release also highlighted financial guidance for FY19, stating that "[f]or the full year 2019, ViewRay anticipates total revenue to be in the range of $111 - $124 million."  Notably, this guidance implied a high conversion rate of the backlog because the backlog supposedly

---

[1]     Unless otherwise indicated, all references to fiscal quarters and years shall follow the "1Q19" or "FY19" nomenclature.

3

translated into revenue over an 18-month period. Multiplying ViewRay's annual guidance by 1.5 (reflecting an 18-month time frame for conversion of the backlog) yields a range of $166.5 to $186 million or 78% to 88% of the Company's backlog at the time. This statement was false and misleading because Defendants lacked a reasonable basis to forecast such high revenue knowing that the Company's backlog comprised many shaky, invalid orders that were not likely to convert into revenue.

8.      Defendants were aware their statements were misleading. The Company's Chief Executive Officer ("CEO") or Chief Operating Officer ("COO") signed the Company's order contracts. Thus, the Company and its top officials knew that, contrary to their representations, many orders lacked a contract with an end-user "customer." Moreover, the Company's top management orchestrated distributors' placement of orders made for the purpose of bulking up the Company's backlog. Therefore, there is no question of Defendants' scienter with respect to this issue. Finally, the Company tracked its compliance – or lack thereof – with its backlog criteria on an order-by-order basis and was therefore aware that many of the orders placed in the backlog were not actually valid. Non-compliance findings were generated by the Company's sales people and internal staff auditors and compiled into reports that were provided to the CEO, COO, and Chief Financial Officer ("CFO"). Additionally, ViewRay's COO discussed the status of ViewRay's backlogged orders on a daily basis, including the specific terms of each contract.

9.      Further, ViewRay is a small company, with only 221 full-time employees as of year-end 2018. The number of orders taken and fulfilled by the Company is an even smaller universe and the core of ViewRay's business. Each and every order is important to the Company's performance, as Defendants repeatedly emphasized to the market. Moreover, Defendants made

detailed statements to the market about backlog and orders and told the market that they regularly reviewed backlog and orders.  The foregoing demonstrates Defendants' access to information regarding, and knowledge of, the Company's backlog and orders.

10.     By inflating ViewRay's backlog and telling the market that backlog was the Company's key metric, Defendants were able to cause ViewRay's stock to trade at artificially high prices.  Defendants took advantage of this price inflation to sell hundreds of millions of dollars worth of Company stock.  For example, on August 15, 2018, the Company conducted a secondary offering and sold $172.5 million worth of stock.

11.     Unsurprisingly, given the inclusion of invalid orders, ViewRay's backlog performed far worse than Defendants led investors to believe it would.  Though they repeatedly stated that orders in the backlog would translate into revenue recognition in about 18 months, that did not happen.  Indeed, the Company's revenue consistently fell about 40% short of its backlog figure.  Moreover, this low conversion rate cannot be explained by ViewRay's capacity to install MRIdian systems because the number of orders installed in a given quarter was consistently below ViewRay's stated capacity limitations.

12.     The truth was partially revealed on August 8, 2019, after the close of trading, when ViewRay disclosed, among other poor performance, that it would miss its guidance due, in part, to international distributors not fulfilling their orders.  In response to this news, the price of ViewRay common stock price plummeted by approximately 54%, or $3.64 per share, to close at $3.10 per share on August 9, 2019, on unusually high trading volume.

13.     The truth was further revealed on January 13, 2020, pre-market, when ViewRay disclosed its preliminary and disappointing results for 4Q19 and FY19, which included low new

orders added to backlog and a continued inability to convert its supposedly large backlog into revenue.  On this news, the price of ViewRay common stock declined over 23%, or $0.895 per share, to close at $2.855 per share on January 13, 2020.

14.     As a result of Defendants' wrongful acts and omissions as alleged herein, Plaintiff and the Class (defined below) purchased ViewRay common stock at artificially inflated prices and suffered significant losses when the truth was revealed.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

17.     Venue is proper in this Judicial District under §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District, where ViewRay is headquartered.

18.     In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of a national securities exchange, the NASDAQ.

## PARTIES

### Plaintiff

19.     Plaintiff Plymouth, as set forth in its certification, purchased ViewRay common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged herein.  *See* ECF No. 28 at 51-53.

### Defendants

20.     Defendant ViewRay is headquartered in Oakwood Village, Ohio.  ViewRay common stock trades on the NASDAQ under the ticker symbol "VRAY."  During the Class Period, ViewRay, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions.

21.     Defendant Scott Drake ("Drake") has served as ViewRay's President, CEO, and a member of the Company's board of directors (the "Board") from June 24, 2018 to the present. Throughout the Class Period, Drake made statements in the Company's periodic filings, press releases, and earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions.  At all relevant times, Drake made those statements and omissions recklessly or with actual knowledge that they were false and misleading.  In his capacity as CEO, Drake signed the Company's order contracts, including international contracts with distributors that did not have customers.  Further, Drake received reports from ViewRay employees detailing issues with the Company's backlog orders.

22.     Defendant Ajay Bansal ("Bansal") served as ViewRay's CFO from June 8, 2016 to September 30, 2019, when he and the Company parted ways.  Throughout the Class Period, Bansal

7

made statements in the Company's periodic filings, press releases, and earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions.  At all relevant times, Bansal made those statements and omissions recklessly or with actual knowledge that they were false and misleading.  Bansal received reports from ViewRay employees detailing issues with the Company's backlog orders.

23.     Defendant James F. Dempsey ("Dempsey") is the founder of ViewRay and has served, at all relevant times, as ViewRay's Chief Scientific Officer and as a member of the ViewRay Board.  During the Class Period, Dempsey sold 327,790 shares of ViewRay common stock for proceeds of approximately $1,421,471.  Dempsey signed the Company's 2018 10-K (defined below), which, as alleged herein, contained material misrepresentations and omissions. At all relevant times, Dempsey knew those statements and omissions were materially false and misleading.  Dempsey sometimes received reports from ViewRay employees regarding issues with the Company's backlog orders.

24.     Defendant Chris A. Raanes ("Raanes") served as ViewRay's President, CEO, and a member of the ViewRay Board from February 4, 2013 through July 22, 2018.  Defendant Raanes made statements in the Company's periodic filings, press releases, and earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions.  At all relevant times, Raanes made those statements and omissions recklessly or with actual knowledge that they were false and misleading.  In his capacity as CEO, Raanes signed the Company's order contracts, including international contracts with distributors that did not have customers.  Further, Raanes received reports from ViewRay employees regarding issues with the Company's backlog orders. Finally, on information and belief, Raanes was CEO during a period when the Company's senior

management solicited sham orders from distributors in order to increase the size of the Company's backlog.  In a different securities fraud case, Raanes was alleged to have manipulated the backlog at Accuray Incorporated ("Accuray"), a competitor of ViewRay.

25.     Defendant Shahriar Matin ("Matin") has served as ViewRay's COO from June 24, 2018 to the present.  Defendant Matin made statements in the Company's earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions when made. Matin made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading.  Matin received reports from ViewRay employees regarding issues with the Company's backlog.

26.     Defendants Drake, Bansal, Dempsey, Raanes, and Matin are collectively referred to herein as the "Executive Defendants."  ViewRay and the Executive Defendants are collectively referred to herein as the "Defendants."

27.     Defendants possessed and exercised their power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their control over the Company, and their access to material information available to them, but not to the public, Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  Defendants are liable for the false statements and omissions pleaded herein.

## FACTUAL ALLEGATIONS

### A.     ViewRay Background

28.     Defendant ViewRay went public in July 2015 through an "alternative public offering."

29.     ViewRay remains a small company.  As of year-end 2018, ViewRay had 221 full-time employees, with about 78% of those employees in non-research and development roles.

30.     ViewRay's sole product is a capital-intensive system known as MRIdian, which uses radiation therapy and MRI to simultaneously image and treat cancer patients.  The Company's original system used Cobalt-60-based radiation beams.  The Company's next generation system had more advanced linear accelerator or 'Linac'-based radiation beams.  The Linac MRIdian received approval from the U.S. Food and Drug Administration in late February 2017, the European Union in September 2016, Taiwan and Canada in August 2017, Israel in November 2017, and Japan in March 2018.  ViewRay had announced that it was developing a Linac MRIdian prior to those approvals and most, if not all, of its pre-existing orders, as well as most, if not all, of its then-potential orders, switched to or chose a Linac MRIdian.  Consequently, after ViewRay announced its Linac MRIdian system, and as the potential approval of that system became closer, it paused installations and delivery of its MRIdian systems, most prominently in 1Q17 and 2Q17.

31.     All of ViewRay's revenue is related to MRIdian systems and virtually all of that is from the sale of those systems.  In 2018 and 2017, revenue recognized in connection with such sales made up 94.6% and 89.5% of ViewRay's total revenue, respectively.

32.     MRIdian systems, and especially Linac MRIdians, are not just expensive in their own right, but are substantially more expensive than most other competing devices that provide

10

radiation therapy, but do not combine it with MRI.  At the same time, a better funded and more established competitor that markets another device combining radiation therapy and MRI has been selling them at a similar price to the approximately $6 million price at which ViewRay sells its Linac MRIdians.

33.     Since going public in 2015, ViewRay has had a constant need to raise additional capital to keep its operations ongoing.  That is because the Company has high expenses and cash needs, while it generates far less revenue.  It has accordingly undertaken numerous capital raises (in addition to its debt financing) prior to and throughout the Class Period:

(a)     On or about January 18, 2017, via another private placement offering, the Company sold approximately 8.6 million shares of common stock and warrants to purchase approximately 1.7 million shares of common stock and thereby raised an additional $26.1 million in gross proceeds;

(b)     On or about October 24, 2017, the Company raised aggregate gross proceeds of approximately $50 million through the issuance and sale of approximately 8.38 million shares of its common stock at $5.95 per share in a direct registered offering to new and existing investors;

(c)     On March 5, 2018, the Company closed a direct registered equity offering with an affiliate of Fosun International Limited for aggregate gross proceeds of approximately $59.1 million;

(d)     Then, on or about August 15, 2018, the Company held a secondary public offering, raising approximately $172.5 million in gross proceeds by selling approximately 18.65 million shares of common stock at a price to the public of $9.25 per share.  This

11

offering was commenced pursuant to registration statements that were filed with the SEC and became effective on May 18 and August 14, 2018, respectively.  The final prospectus supplement and accompanying prospectus relating to and describing the terms of the offering was filed with the SEC on August 15, 2018; and

(e)     Further, on or about December 4, 2019, the Company held another public offering, raising approximately $149.6 million in gross proceeds by selling approximately 47.78 million shares of common stock at a price to the public of $3.13 per share.  The registration statement relating to this offering was filed with the SEC and became effective on February 7, 2019.  This offering was made solely by means of a prospectus supplement and accompanying prospectus included in the registration statement.  A final prospectus supplement and accompanying prospectus relating to the offering was filed with the SEC on December 5, 2019.

34.     In July 2018, ViewRay underwent a sudden turnover in management.  Defendant Drake was brought in as President and CEO, replacing the outgoing Defendant Raanes, who had been President and CEO since February 2013, and Defendant Matin was made COO.

**B.     Orders and Installation of MRIdian Systems**

35.     ViewRay sells MRIdian through different means in North America, where about one-third of its sales take place, than in the rest of the world, where two-thirds of its sales occur. In North America, ViewRay employs a direct sales force.  In the rest of the world, the Company primarily markets MRIdian through third-party distributors, supported by ViewRay employees.

36.     It typically takes nine to 15 months for a ViewRay customer to prepare its facility to receive a new system after an order contract is executed (referred to as "vault readiness").

Installation then takes an additional 60 to 90 days.  The Company often discussed this 18-month

timetable from order to revenue recognition.  For example, at the January 9, 2019 JPMorgan Global

Healthcare Conference, Defendant Drake stated that "[t]he installations is really a consequence of

those orders that were placed, in our case, about 18 months ago."  Similarly, during the Company's

2Q19 earnings call on August 8, 2019, Defendant Drake noted "[o]ur stated target has been to

reduce this time frame from approximately 18 to 12 months."

37.     ViewRay purportedly does not recognize revenue on any of its orders until the

system is installed and accepted by the customer.  Alternately, in the case of sales involving its

international distributors, revenue is recognized when the system is delivered to the customer.

38.     Because the average time from contract order to revenue recognition had been at

least a year, and more often upwards of 18 months, Defendants explained that they had visibility

into the timing of when its backlog would be recognized as revenue.  Indeed, they repeatedly stated

that revenue was "baked" about one year before it was recognized.

**C.     ViewRay Has Struggled to Grow Its Revenue and Operates at a Loss**

39.     ViewRay has struggled to increase its revenue.  Over the past three years, from

1Q17 through 4Q19, ViewRay had proven unable to convert its orders into revenue.  The

Company's revenue remained largely flat from 2018 to 2019, even as it experienced increasing

costs.  As a result, the Company had low cash on hand and operated at a loss for every quarter

since the approval of its MRIdian system.  In FY18, the Company's reported revenue increased to

$81 million, cost of revenue increased to $74.4 million, cash on hand increased to $167.4 million,

as a result of a public offering, and net operating losses increased to $79.1 million.  For FY19, the

Company reported preliminary results with revenue of $88 million and cash on hand of $227 million, mainly as a result of another public offering.

        **D.**      **To Compensate, and Show Purported Success, Defendants Touted ViewRay's Purported Backlog, Which They Claimed Was the Company's "Most Important Metric"**

      40.     In an effort to comfort investors over its poor revenue generation and inability to operate at a profit, the Company emphasized its significant backlog as the true marker of the Company's success.  For example, during the Company's 1Q18 earnings call on November 8, 2018, in response to a question regarding milestones used to measure progress, Defendant Drake stated that "***I think orders is a big one and we're shining a bright light on that internally obviously***, ***and with investors as well. I think that's critically important and that will show how our customers are voting with their pocketbook***."[2]  At the JPMorgan Healthcare Conference on January 9, 2019, Defendant Drake reiterated the importance of the backlog, telling investors that "***that the most import[ant] metric to me in 2019 is orders is because that's what we can impact***."  Similarly, on the Company's 2Q19 earnings call on August 8, 2019, in response to a question regarding the path to profitability, Defendant Drake explained that "***the most important metrics that we have certainly are orders*** and revenue and cash utilization, and we're highlighting those."

      41.     Analysts, relying on the Company's representations, viewed the backlog as the critical barometer through which to judge ViewRay's success, in spite of stagnant revenues and lack of an operating profit.  For example, on November 14, 2017, an analyst at BTIG LLC ("BTIG") stated, "[w]e see orders as [a] most important" factor for ViewRay.  On January 8, 2018,

---

[2]     Unless otherwise indicated, all emphases in materials quoted herein are added, with original emphases and citations omitted.

BTIG analysts lauded the increase in the Company's backlog and reiterated its view of the backlog's importance, stating "[a]s a result, backlog increased to $200M at the end of 2017. VRAY shares climbed higher throughout the back half of 2017 and with all eyes on system orders and revenue conversion, we think shares will trade off today."  Further, on March 15, 2019, analysts at Morgan Stanley Research ("Morgan Stanley") expressed a similar sentiment, stating that "[c]ommercial execution to drive new orders and converting to sales remains the focus."

42.    In furtherance of its efforts to convince the market of the importance of its backlog, the Company repeatedly told investors that the backlog is constantly reviewed, that all orders in the backlog were valid and identified an end-user, and that those orders met the criteria for inclusion in the backlog.  For example, on August 7, 2017, during the Company's 2Q17 earnings call, Defendant Raanes stated that:

> *[I]n terms of net versus gross backlog, since we announce it every quarter, you can go back and you can go look at that, right, and you'll see that the backlog simply went up by the amount of the orders we took this quarter. So that answers that one. Then in terms of the age of the backlog, et cetera, I strongly believe that the criteria we have right now is absolutely right. We don't give out the age of the backlog.* But given that we last year pivoted the whole business from Cobalt to linac and almost everybody decided to wait, that automatically added sort of a year plus to everyone in the backlog. *So I think right now, the criteria we have is correct. We take it very, very seriously. The criteria is out there. It's published for everyone to read.* And I think your other question was about U.S. versus OUS. *And I didn't do the exact math, but last time I looked at the overall backlog, including the new ones, it was still very closely sticking to the 2/3 outside the U.S., 1/3 inside the U.S., and that includes the current quarter.*

43.    Similarly, on August 3, 2018, during the Company's 2Q18 earnings call, in response to an analyst's question regarding the stability of the backlog, Defendant Bansal explained that because of the orders that were recorded in 2016 and 2017, and the Company's

vigilance in reviewing the backlog, "*a large portion of our backlog is fairly current*" and "*fairly sticky*."  He continued:

> *[S]o if you look at the orders we took in '16 and the orders we took in '17, we have announced we took 13 orders in '16 and we took 19 orders in '17. So that adds up to 32. So most of our backlog, a large portion of our backlog is fairly current. There are some units in the backlog which are older aged and that primarily has to do with some customers having ordered Cobalt systems earlier and now converting them to the linacs, and with respect to the cancellation rate, as I mentioned, before, we took 2 units out of backlog in our cancellations, we have just taken them out of backlog because with a couple of distributors we did not see enough movement on those couple of projects. Overall, in the last year or 2, we've had, I believe, 2 cancellations or 3 cancellations in total. So it's a fairly sticky backlog. As we have shared with you, these institutions have to make a very conscious decision to switch from something they've been doing for 30 years with the cone beam CT linac to go for an MRI linac and pay the kind of money that our product is worth. So they make these decisions with a lot of thought, and that leads to the stickiness of the backlog.*

44.    Relatedly, on January 7, 2019, the Company stated in its Form 8-K that, "*[w]hile we will continue to review the backlog each quarter, our recent thorough review is now complete*."  On January 9, 2019, at the JPMorgan Global Healthcare Conference, Defendant Drake added that the Company had "scrubbed" its backlog, stating "*We have scrubbed what I'm calling the legacy backlog of the company*."  Then, on March 4, 2019, during its 4Q18 earnings call, ViewRay once again referred to its completed backlog review, stating that "*[i]n the fourth quarter of 2018, we removed 3 systems from our backlog. While we'll continue to review the backlog each quarter, our recent thorough review is now complete*."

45.    The Company's SEC filings contained the same assurances with regard to backlog. For example, its 1Q18 Form 10-Q, dated and filed with the SEC on May 10, 2018, and signed by Defendants Raanes and Bansal, stated:

> *We perform a quarterly review of backlog to verify that outstanding orders in backlog remain valid, and based upon this review, orders that are no longer*

*expected to result in revenue are removed from backlog. Among other criteria we use to determine whether a transaction to be in backlog, we must possess both an outstanding and effective written agreement for the delivery of a MRIdian signed by a customer with a minimum customer deposit or a letter of credit requirement, except when the sale is to a customer where a deposit is not deemed necessary or customary (i.e. sale to a government entity, a large hospital, group of hospitals or cancer care group that has sufficient credit, sales via tender awards, or indirect channel sales that have signed contracts with end-customers). We decide whether to remove an order from our backlog by evaluating the following criteria: changes in customer or distributor plans or financial conditions; the customer's or distributor's continued intent and ability to fulfill the order contract; changes to regulatory requirements; the status of regulatory approval required in the customer's jurisdiction, if any; and other reasons for potential cancellation of order contracts.*

(As set forth below, similar language appeared in many of the Company's other SEC filings.)

46.     Analysts reacted positively to and accepted the claims described above.  For example, on January 7, 2019, analysts at Morgan Stanley stated:

> ViewRay completed its backlog review. In recent quarters management has reviewed the company's backlog to determine if any units should be removed given the age of the order or lack of progress towards a sale. This resulted in the removal of 8 systems from the backlog (including 3 systems in 4Q18) over the past three quarters. The company announced that it has now completed the review of its backlog, a positive in our view, as systems being removed from the sales pipeline has been a headwind to backlog growth in recent quarters. Moving forward, this headwind should moderate leading to more growth in ViewRay's backlog.

### E.     Significantly, However, Defendants were Inflating ViewRay's Orders and Backlog

47.     ViewRay's backlog has not performed in the manner that Defendants promised it would.  Though they repeatedly stated that orders in backlog would translate into revenue recognition in about 18 months, as the following charts show, that did not happen:

### ViewRay's Reported Backlog and Revenue[3]

| | 1Q17 | 2Q17 | 3Q17 | 4Q17 | 1Q18 | 2Q18 | 3Q18 | 4Q18 | 1Q19 | 2Q19 | 3Q19 | 4Q19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Backlog $ | **$144.90** | **$182.10** | **$194.80** | **$203.63** | **$195.00** | **$199.70** | **$200.90** | **$212.31** | **$237.50** | **$219.30** | **$230.00** | **$227.00** |
| Implied Backlog Units | 25 | 31 | 34 | 35 | 34 | 34 | 35 | 37 | 41 | 38 | 40 | 39 |
| New Orders $ | $12.30 | $37.30 | $29.90 | $34.10 | $21.20 | $34.60 | $36.20 | $48.70 | $42.80 | $18.10 | $36.40 | $21.00 |
| New Orders Units | 2 (plus 3 upgrades) | 6 | 5 | 6 | 3 | 6 | 6 | 8 | 7 | 3 | 5 (plus 3 upgrades) | 4 |
| Total Non-Revenue Units Removed from Backlog | 0 | 0 | 1 | 1 | 1 | 2 | 3 | 3 | 0 | 0 | 1 | unknown |
| Revenue Units | 0 | 0 | 2 | 4 | 4 (plus 1 upgrade) | 3 | 3 | 3 (plus 1 upgrade) | 3 (plus 1 upgrade) | 5 | 3 | 2 (plus 1 upgrade) |
| Product Revenue | $0.00 | $0.00 | $11.36 | $19.10 | $25.38 | $15.37 | $16.49 | $19.40 | $18.87 | $27.91 | $18.70 | less than $17.00 |

---

[3]     Dollar figures are in millions.  With respect to "Implied Backlog Units," in FY17, ViewRay stopped, as a policy, providing numbers on how many systems are in its backlog, which it had previously done.  Although older backlog information was available, and Defendants sometimes provided information about the number of new or removed backlog orders, to check the number of "Implied Backlog Units," the chart uses a price of approximately $6 million per unit, which was based, among other things, on the prices and related commentary that Defendants made regarding Linac MRIdians.  With respect to "New Order Units," ViewRay sometimes, but not always, provides the number of new order units that comprise its New Order dollar figure.  Where Defendants did not appear to provide the number of new order units (*i.e.*, 2Q17, 3Q17, 2Q18, 3Q18), the chart again uses a price of approximately $6 million per unit to calculate that number. Also note that the Company has only provided "preliminary" figures for 4Q19.

**ViewRay's Inflated Backlog**

| | 1Q17 | 2Q17 | 3Q17 | 4Q17 | 1Q18 | 2Q18 |
|---|---|---|---|---|---|---|
| Total Backlog $ | **$144.90** | **$182.10** | **$194.80** | **$203.63** | **$195.00** | **$199.70** |
| Revenue Recognized Over Next 6 Quarters | $87.70 | $107.10 | $114.61 | $123.42 | $116.73 | $118.37 |
| $ Shortfall | **($57.21)** | **($75.01)** | **($80.19)** | **($80.21)** | **($78.27)** | **($81.33)** |
| | | | | | | |
| Total Backlog $ | **$144.90** | **$182.10** | **$194.80** | **$203.63** | **$195.00** | **$199.70** |
| Revenue Recognized 6 Quarters Later | $16.49 | $19.40 | $18.87 | $27.91 | $27.91 | $18.70 |
| $ Shortfall | **($128.41)** | **($162.70)** | **($175.93)** | **($175.72)** | **($167.10)** | **($181.00)** |

48.     Importantly, as demonstrated by the foregoing chart, the Company's revenue over an 18-month period consistently fell 40% short of the backlog, an astounding shortfall.  Further, the amount of revenue recognition in a given quarter was substantially less than the amount of backlog 18 months earlier.  Moreover, that cannot be explained by ViewRay's capacity to install MRIdian systems because the number of orders installed in a given quarter was consistently below ViewRay's capacity limitations.

49.     Defendants were, in fact, inflating ViewRay's backlog with invalid orders that did not meet all of the criteria for inclusion in backlog.  For one, in the foreign market, which accounted for two-thirds of ViewRay's business and backlog, the Company frequently did not have contracts with customers.  Rather, the Company received placeholder orders from third-party distributors and put those orders into backlog.  Defendants admitted this fact in their reply brief filed in support of their pending motion to dismiss.  *See* ECF No. 50 at 1.  Specifically, when faced with Plaintiff's allegation that the Company diverged from its backlog criteria, Defendants respond by admitting that was the case:

> Plaintiff repeatedly claims ViewRay "diverg[ed]" from its "criteria" for adding
> orders to its backlog. Yet, the plain terms of those criteria show that ViewRay does
> not require a signed contract with an end-user for an order to be included in its

backlog. To add an order to the backlog, ViewRay generally requires a written agreement signed by a "customer." ViewRay's "customers" include both end-users of its systems and distributors who market and resell the systems internationally. ***ViewRay never said than an order placed by a distributor was included in the backlog only if the distributor also had a contract with an end-user.***

*Id.* This admission is damning because, as set forth below, ViewRay clearly did say that a distributor order only went into the backlog if there was a contract with an end-user. *See infra* ¶73.

50.    Defendants' admission is corroborated by the statements of former ViewRay employees. For example, Confidential Witness 1 ("CW1") worked in sales at the Company during the Class Period. Among other things, CW1 worked with international distributors to close deals. On a regular basis, CW1 worked with the CEO, CFO, and COO of the Company.

51.    Per CW1, ViewRay had various distributors in Europe, including those based in France, the Benelux nations, the United Kingdom, and Turkey. Examples include Qualimedis in France, the De Ceunyck Medical Group in the Benelux region, and the Medical International Group for the Middle East.

52.    CW1 observed that, for distributor orders, it was possible for the intended end-customer to "back out," which would cause the distributor to try and find another customer to take the unit. For example, CW1 recalled that the Company had two orders in backlog that had been derived from a distributor in the Middle East. Six months later, the distributor indicated that it still had no additional information to convey to ViewRay regarding the intended customers' willingness to purchase the units. CW1 observed that ViewRay's CEO or COO signed its sales contracts.

53.     As another example of the tenuous nature of distributor orders, on August 8, 2019, Defendants held a press conference with securities analysts during which they made partial disclosures, including that a guidance miss was partially due to purported orders for two MRIdian systems involving a foreign distributor that was not able to fulfill those orders.  Specifically, Defendant Drake stated, "[f]urther on revenue guidance. We have removed two other systems due to a distributor potentially not fulfilling their commitment this year."

54.     On information and belief, it was common practice for ViewRay's distributors in Europe to issue a down payment for an order themselves, where no end-user agreement had been signed.  The down payment could be as little as $100,000, and oftentimes such payments were made in consideration for the distributor to receive another year of exclusive distributor rights for MRIdian systems in the European territory which they oversaw.

55.     Moreover, foreign orders were more susceptible to manipulation because they were not made through the Company's direct sales force in North America.  On  information and belief, the Company's top management exploited the Company's close distributor ties in order to add distributor-derived orders to the backlog.  For example, the Company's CEO or CFO would communicate that they needed to come up with one or two additional orders for the backlog.  These directives oftentimes were issued as the close of a fiscal quarter drew near.  To effectuate this objective, the Company conveyed its desire to obtain additional orders to its distributors and would thereafter "get paperwork" from the distributors.  This meant that distributors would execute orders with ViewRay despite the distributors not having any bona fide customers that had entered into contracts for the purchase of MRIdian systems.  For example, in 2018, the Company claimed to have closed a sale with an end-user customer in the Benelux region, but the sale never materialized.

Nevertheless, the distributor maintained the order despite not having an end-user anymore. Two similar situations occurred in 2018 in Italy and the Middle East, where distributors placed orders despite not having end-user agreements in place.

56.     Confidential Witness 2 ("CW2") was a senior official who worked at the Company toward the end of the Class Period. CW2 reported to C-Level executives at the Company regarding sales data, including CEO Drake and COO Matin, on a monthly basis. CW2 also met with these officials on several occasions. Part of CW2's job involved taking notes on sales executives' meetings with customers who had contractual agreements to install MRIdian systems, but who had not done so. Both the international and domestic sales teams participated in these calls.

57.     Based on these ongoing calls, CW2 grew concerned about the fact that certain orders had been in backlog for extended periods of time and/or were tied to customers who had expressed inability to move forward with paying in full and accepting delivery of MRIdian systems within a reasonable amount of time. As CW2 stated, "so much of it [*i.e.*, the order in the backlog] was very very dated." CW2's colleague on the project – a Vice President-level executive – expressed similar concern.

58.     For example, during the calls with domestic sales personnel, CW2 recalled that an Area Sales Director had reported that one of his accounts/customers – a university – was not moving forward with the installation of the MRIdian system, despite a signed contract in place and the fact that the order had been placed in backlog.

59.     In another example, an order from a different university had been put in backlog despite either having no deposit or a deposit that was so small that it was not an impediment to the

customer walking away from the order.  The client had also indicated that it would not move forward with the order until 2021.

60.     In another example, CW2 recalled that another client, a university hospital, had ordered two units and that both units were placed in backlog.  However, the second unit was never paid for or installed and the client was unclear as to when it would proceed with that purchase.

61.     CW2 recalled that certain orders derived from a third-party distributor in China (or possibly the greater Asia Pacific region) had been in the backlog for years.  To the best of CW2's recollection, these orders dated back to 2015 or 2016.  CW2 believes that the distributor may have actually taken delivery of the units in question and warehoused them, but had been unable to "on-sell" the units to its ostensible end-user customers.

62.     Confidential Witness 3 ("CW3") was a senior employee whose job function involved assisting in the tracking and internal reporting on the backlog during the Class Period.  This process involved identifying the stage of contractual performance at which each contract stood, as well as the specific impediments and challenges for each contract, that could potentially delay revenue recognition.  CW3 gathered and carefully reviewed all associated documentation for each existing contract.  Through this process, CW3 sought to identify and understand all of the terms and obligations that existed between both parties – ViewRay and any given customer – for each contract.  CW3 worked with the Company's COO.

63.     CW3 observed that formalized reports were prepared detailing the terms of each contract, as well as the contractual stage for each.  These reports were distributed to the Company's top executives.  CW1, discussing the same issue, provided the additional detail that the Company's CEO, COO, and CFO, and sometimes Defendant Dempsey, received the reports and that the

reports were issued on a bi-weekly basis.  CW1 also observed that the CEO, COO, and CFO had a bi-weekly meeting to discuss the substance of the report and the likelihood as to whether any given order in the backlog would move forward into a fully performed revenue-generating sale.

64.     CW3 communicated with the COO on a daily basis, often multiple times a day. The two would regularly discuss each sales contract, including the specific terms associated therewith and "what we needed to do to get the unit in the ground [*i.e.*, installed at the customer site]."  When CW3 visited headquarters, these types of conversations occurred in person.  During in-person meetings, CEO Raanes frequently participated.  The three would list sales deals on a white board and chart out the various items that would be required, on a contract-by-contract basis, in order for each customer to "accept" delivery of the device.

65.     Consistent with the foregoing events, prior to joining ViewRay as CEO, Defendant Raanes was the COO of Accuray, one of ViewRay's competitors and which had entered into an eight-figure settlement based on securities fraud allegations related to, among other things, overstated backlog involving foreign distributors.  Accuray also sold a capital-intensive medical device that combined imaging and a linac technology, and that was installed in a bunker, to treat tumors.  This was its only product.  Among other things, Accuray inflated its backlog by improperly counting orders with no identifiable end-users, including through international distributors.  As the COO of Accuray, Raanes would have known of this scheme and indeed sold $1,368,000 worth of Accuray stock while its price was artificially inflated.

66.     Also consistent with the foregoing events, an August 13, 2019 short-seller report published on *Seeking Alpha* regarding ViewRay stated that:

> We spoke to several industry participants familiar with VRAY's backlog and
> learned that much of the backlog is based on orders placed by distributors, not end

customers. In other words, these distributors place preliminary orders for a VRAY MRIdian machine with no end customer (e.g., a hospital) to sell it to. So these orders are essentially 'placeholders' until a final order can be placed with an end customer.

67.     Among other criteria that would make orders through international distributors (or any other means) invalid for backlog, including under the Company's definition, is the absence of an actual contract with an end-user customer.  Defendants never warned the market that ViewRay's backlog, in fact, included invalid or otherwise inappropriate orders.

68.     ViewRay's consistent need to raise capital to cover its operating costs is also consistent with the foregoing events.  By inflating ViewRay's backlog and telling the market that backlog was the Company's key metric, Defendants were able to cause ViewRay's stock to trade at artificial prices and thereby increase the amount of capital they could raise.

69.     Further, regular reviews of its backlog not only served to convince the market of the backlog's firmness, but also demonstrated that Defendants were aware of and had access to the invalid orders in the Company's backlog.

## FALSE AND MISLEADING STATEMENTS

70.     On May 10, 2018, ViewRay issued a press release announcing its 1Q18 results, which was filed with the SEC as part of a Form 8-K signed by Defendant Raanes.  The press release stated that ViewRay's revenue for the quarter was $26.2 million, and its net loss was $7.5 million.

71.     The press release contained materially false and misleading statements.  In particular, it reported that "*[t]otal backlog grew year over year to $195.0 million, as of March 31, 2018, up from $144.9 million as of March 31, 2017.*"

72.    Later on May 10, 2018, Defendants held a press conference with securities analysts during which they made additional materially false and misleading statements regarding ViewRay's backlog, orders, ability to turn backlog into recognized revenue, and positioning for success.  In that regard, Defendant Raanes stated that "***We're scaling up our ability to secure new orders and install more systems simultaneously.***"  In response to a question about installation capacity, Defendant Raanes also stated:

> ***On the install process, we're making solid progress on that. The install times continue to come down, and we see ourselves on track to be in the 30- to 40-day range by the end of the year.*** So we're feeling real good about that. We continue to maintain the teams, such the 3 internal installs, 2 externals, and actually, we're done training the third group out. So we should be able to do 3 internal and 3 external.

On the same call, Defendant Bansal stated that "***[o]ur backlog at March 31, 2018, was $195 million.***"

73.    The Company's 1Q18 Form 10-Q, dated and filed with the SEC on May 10, 2018, and signed by Defendants Raanes and Bansal, made additional false and misleading statements about the Company's backlog.[4]  It stated:

> ***We perform a quarterly review of backlog to verify that outstanding orders in backlog remain valid, and based upon this review, orders that are no longer expected to result in revenue are removed from backlog. Among other criteria we use to determine whether a transaction to be in backlog, we must possess both an outstanding and effective written agreement for the delivery of a MRIdian signed by a customer with a minimum customer deposit or a letter of credit requirement, except when the sale is to a customer where a deposit is not deemed necessary or customary (i.e. sale to a government entity, a large hospital, group of hospitals or cancer care group that has sufficient credit, sales via tender awards, or indirect channel sales that have signed contracts with end-customers). We decide whether to remove an order from our backlog by evaluating the following criteria: changes in customer or distributor plans or financial conditions; the customer's***

---

[4]    The final prospectus for the August 15, 2018 offering incorporates, by reference, the 1Q18 Form 10-Q, which contained materially false and misleading statements, as detailed *infra*.

*or distributor's continued intent and ability to fulfill the order contract; changes to regulatory requirements; the status of regulatory approval required in the customer's jurisdiction, if any; and other reasons for potential cancellation of order contracts.*

*During the three months ended March 31, 2018, we received new orders for MRIdian systems, totaling $21.2 million, and based on our backlog review, we removed one order from our backlog. At March 31, 2018, we had total backlog of $195.0 million.*

74.    Related to the preceding paragraph, the Company stated in its FY17 Form 10-K, filed with the SEC on March 12, 2018 ("2017 10-K"), that: "Our customer contracts provide that our customers commit to purchase a MRIdian system for a fixed price, and a MRIdian system will generally not be delivered for 11 to 15 months."

75.    The foregoing statements in ¶¶70-74 were materially false and misleading because: (i) Defendants overstated the validity, value, and implied number of the purported orders that the Company actually had in its backlog, as illustrated by, among other things, the large gap between ViewRay's backlog and its revenue 18 months later, and ViewRay's eventual admission that an international distributor could not fulfill its commitments on several orders; and (ii) Defendants failed to disclose that they included invalid orders in backlog, including under the Company's stated criteria, involving international distributors that did not have a contract with an end-user customer, were stale, or had other indicia of unreliability.

76.    On August 3, 2018, ViewRay issued a press release announcing its 2Q18 results, which was filed with the SEC as part of a Form 8-K signed by Defendant Drake.  The press release stated that ViewRay's revenue for the quarter was $16.4 million, and its net loss was $22 million.

77.     The press release contained materially false and misleading statements.   In particular, it reported that "*[t]otal backlog grew year-over-year to approximately $200 million as of June 30, 2018, up from approximately $182 million as of June 30, 2017.*"

78.     Later on August 3, 2018, Defendants held a press conference with securities analysts during which they made additional materially false and misleading statements regarding ViewRay's backlog, orders, ability to turn backlog into recognized revenue, and positioning for success.  In response to an analyst's question regarding a minor reduction in backlog, Defendant Bansal claimed that "*because of some of the aging and some of the nonprogress on a couple of accounts, we took them out of our backlog.*"  He also claimed that "*a large portion of our backlog is fairly current*" and "*fairly sticky*," stating:

> *[S]o if you look at the orders we took in '16 and the orders we took in '17, we have announced we took 13 orders in '16 and we took 19 orders in '17. So that adds up to 32. So most of our backlog, a large portion of our backlog is fairly current. There are some units in the backlog which are older aged and that primarily has to do with some customers having ordered Cobalt systems earlier and now converting them to the linacs, and with respect to the cancellation rate, as I mentioned, before, we took 2 units out of backlog in our cancellations, we have just taken them out of backlog because with a couple of distributors we did not see enough movement on those couple of projects.  Overall, in the last year or 2, we've had, I believe, 2 cancellations or 3 cancellations in total. So it's a fairly sticky backlog. As we have shared with you, these institutions have to make a very conscious decision to switch from something they've been doing for 30 years with the cone beam CT linac to go for an MRI linac and pay the kind of money that our product is worth. So they make these decisions with a lot of thought, and that leads to the stickiness of the backlog.*

79.     The Company's 2Q18 Form 10-Q, dated and filed with the SEC on August 7, 2018, and signed by Defendants Drake and Bansal, made materially false and misleading statements about the Company's backlog substantially identical to those made in the 1Q18 Form 10-Q, as

cited in ¶59.  The 2Q18 Form 10-Q also stated that "[a]t June 30, 2018, we had total backlog of $199.7 million."

80.     The foregoing statements in ¶¶76-79 were materially false and misleading because: (i) Defendants overstated the validity, value, and implied number of the purported orders that the Company actually had in its backlog, as illustrated by, among other things, the large gap between ViewRay's backlog and its revenue 18 months later, and ViewRay's eventual admission that an international distributor could not fulfill its commitments on several orders; and (ii) Defendants failed to disclose that they included invalid orders in backlog, including under the Company's stated criteria, involving international distributors that did not have a contract with an end-user customer, were stale, or had other indicia of unreliability.

81.     On November 8, 2018, ViewRay issued a press release announcing its 3Q18 results, which was filed with the SEC as part of a Form 8-K signed by Defendant Drake.  The press release stated that ViewRay's revenue for the quarter was $17.7 million, and its net loss was $32.9 million.

82.     The press release contained materially false and misleading statements.   In particular, it reported that "*[t]he backlog as of September 30, 2018 was $200.9 million.*"

83.     Later on November 8, 2018, Defendants held a press conference with securities analysts during which they made additional materially false and misleading statements regarding ViewRay's backlog, orders, ability to turn backlog into recognized revenue, and positioning for success.  In response to a question from an analyst regarding removal of orders from the backlog, Defendant Drake stated, "[s]o we had 3 systems come out this time as we noted. ***There was no loss of orders per se. It's just us applying the criteria that, I think, I highlighted on the last call. So that's just us being prudent and disciplined as it relates to our backlog***."  Defendant Drake

also claimed that "*[i]t became more of an aging issue from our criteria standpoint. We still have the orders. I mentioned that on the call, you may have missed that, earlier. But the orders are still in hand. But it's gotten to a point from an aging standpoint that we think it's prudent to take them out*."  Defendant Bansal further stated that "*[a]t the end of the quarter, our backlog stood at approximately $201 million*."

84.     The Company's 3Q18 Form 10-Q, dated and filed with the SEC on November 9, 2018, and signed by Defendants Drake and Bansal, made materially false and misleading statements about the Company's backlog substantially identical to those made in the 1Q18 Form 10-Q, as cited in ¶73.  The 3Q18 Form 10-Q also stated that "*[a]t September 30, 2018, we had total backlog of $200.9 million.*"

85.     The foregoing statements in ¶¶81-84 were materially false and misleading because: (i) Defendants overstated the validity, value, and implied number of the purported orders that the Company actually had in its backlog, as illustrated by, among other things, the large gap between ViewRay's backlog and its revenue 18 months later, and ViewRay's eventual admission that an international distributor could not fulfill its commitments on several orders; and (ii) Defendants failed to disclose that they included invalid orders in backlog, including under the Company's stated criteria, involving international distributors that did not have a contract with an end-user customer, were stale, or had other indicia of unreliability.

86.     On January 7, 2019, ViewRay issued a press release announcing its preliminary 4Q18 and FY18 results, which was filed with the SEC as part of a Form 8-K.  The press release stated that "'*[d]uring the quarter our backlog grew to $212 million, and we removed three systems. While we will continue to review the backlog each quarter, our recent thorough review*

*is now complete*."'  This statement was materially false and misleading because: (i) Defendants overstated the validity, value, and implied number of the purported orders that the Company actually had in its backlog, as illustrated by, among other things, the large gap between ViewRay's backlog and its revenue 18 months later, and ViewRay's eventual admission that an international distributor could not fulfill its commitments on several orders; and (ii) Defendants failed to disclose that they included invalid orders in backlog, including under the Company's stated criteria, involving international distributors that did not have a contract with an end-user customer.

87.  On January 9, 2019, at the JPMorgan Global Healthcare Conference with securities analysts, Defendants made materially false and misleading statements regarding ViewRay's backlog, orders, ability to turn backlog into recognized revenue, and positioning for success. Defendant Drake touted the Company's purported backlog, telling the market that "*[w]e have scrubbed what I'm calling the legacy backlog of the company.*"  In response to a question regarding the time from when an order is placed to when it will be installed and its revenue recognized, Defendant Drake stated:

> *Generally speaking, if we had 8 orders placed in Q4 of '18 roughly, right, think of the fact that we have to have capacity to do 8 installations in Q4 of '19. Roughly -- targeting getting to a 12-month process.* So that's kind of roughly, right, how I would think about it. That capacity is being built by [Defendant Matin] and his team. We are for the first time actively engaging in the vault readiness process with program managers and engineers. Prior to this, we were very passive about that process. And now, we're driving it forward. So I think -- the reason I've said to The Street that *the most import metric to me in 2019 is orders is because that's what we can impact. The installations is really a consequence of those orders that were placed, in our case, about 18 months ago.*

He continued:

> *So the question is do we have confidence that we'll be able to install what's forthcoming in 2019 and recognize revenue. The short answer to that is yes.* [Chief Commercial Officer] Jim [Alecxih] and I are working as hard as we can to

make the -- problem in the company, [Defendant Matin] is to solve, by driving orders up, to make it a challenge for our ops team to really have to get going even further and faster. We've built a team and we're building a team that will have the capability to do what we need to do operationally. I'm confident of that.

88.     The statements in the preceding paragraph were materially false and misleading because: (i) Defendants overstated the validity, value, and implied number of the purported orders that the Company actually had in its backlog, as illustrated by, among other things, the large gap between ViewRay's backlog and its revenue 18 months later, and ViewRay's eventual admission that an international distributor could not fulfill its commitments on several orders; and (ii) Defendants failed to disclose that they included invalid orders in backlog, including under the Company's stated criteria, involving international distributors that did not have a contract with an end-user customer, were stale, or had other indicia of unreliability.

89.     On March 14, 2019, ViewRay issued a press release announcing its 4Q18 and FY18 results, which was filed with the SEC as part of a Form 8-K. The press release stated that ViewRay's revenue for the quarter was $20.7 million, and its net loss was $16.7 million. The press release also stated that ViewRay's revenue for FY18 was $81 million, and its net loss was $79.1 million.

90.     The press release contained materially false and misleading statements. In particular, it reported that "*[t]otal backlog increased to $212.3 million as of December 31, 2018, up from $203.6 million as of December 31, 2017.*" The press release also highlighted financial guidance for FY19, stating that "*[f]or the full year 2019, ViewRay anticipates total revenue to be in the range of $111 - $124 million*, and total cash usage to be in the range of $65 - $75 million."

91.     Later on March 14, 2019, Defendants held a press conference with securities analysts during which they made additional materially false and misleading statements regarding

ViewRay's backlog, orders, ability to turn backlog into recognized revenue, and positioning for success.  Defendant Drake claimed that "***[t]he majority of our vault readiness team is in place, and we are actively engaging with every customer to prepare for installation and shorten the overall time frame from purchase order to revenue recognition and first patient treated. We are experiencing shorter PO to rev rec time frames and expect continued progress.***"  He also stated that "***[f]rom a revenue perspective, as you know, revenue is largely baked a year in advance given the lead times in the business.***"

92.     In responding to a question regarding revenue, Defendant Drake answered:

Well, we want to be very thoughtful about the guidance that we set[.] . . . We're obviously early in the year. We think we've put it in the right place. Midpoint of that range, as I mentioned, is about 45% growth over prior year. And we feel good about that on an expanding base of business. So if we got to the point where we felt like a change were warranted, we would certainly make The Street aware of that, but we think we've set it in an appropriate place. ***I would tell you, from a revenue perspective, I feel really good about our capability and expanding capability of turning purchase orders into revenue recognition. I think the team is doing very thoughtful work. Our goal is to get those right and solid versus doing them as quickly as we can. That is a change from how the company was being operated previously. So I am in no rush to try to drive revenue falsely north in any way by hurrying an installation.*** I am much more interested in delivering customer delight. We believe fervently in the opportunity that lies ahead and the size of that opportunity, and the value proposition that we bring to that opportunity yields a certain amount of patience that we have to get things right and to do them very solid going forward.

93.     In response to an analyst question regarding ViewRay's ability to install the orders in its backlog, Defendant Drake stated:

Yes, I think that's right. I mean, my goal is to get to the point where we're installing systems at the speed that our customers desire. ***And I would say that, historically, kind of us not proactively engaging from a vault readiness standpoint was probably the biggest reason for that average of 18 months from PO to rev rec versus where we're heading, which we think is roughly 12 months.***

94.     Defendant Drake further sought to assuage the market by telling them that "*[i]n the fourth quarter of 2018, we removed 3 systems from our backlog. While we'll continue to review the backlog each quarter, our recent thorough review is now complete.*"

95.     The Company's annual report for FY18, dated and filed on Form 10-K with SEC on March 15, 2019 ("2018 10-K"), and signed by Defendants Drake, Bansal, and Dempsey, among others, made materially false and misleading statements about the Company's backlog substantially identical to those made in the 1Q18 Form 10-Q, as cited in ¶73.  The 2018 10-K also stated that "*[b]ased on our assessment, we removed $53.5 million and $11.1 million from the backlog for fiscal year 2018 and 2017 respectively; none were removed for fiscal year 2016. At December 31, 2018, we had a backlog with a total value of $212.3 million.*"

96.     The 2018 10-K also included statements that:

*We evaluate our backlog at least quarterly to determine if the orders continue to meet our criteria for inclusion in backlog. We may adjust our reported backlog to account for any changes in: customer or distributor plans or financial conditions; the customer's or distributor's continued intent and ability to fulfill the order contract; regulatory requirements; the status of regulatory approval required in the customer's jurisdiction (or other factors); or due to changes in our judgment about the likelihood of completing an order contract.*

97.     The Company also stated in its 2018 10-K that: "Our customer contracts provide that our customers commit to purchase a MRIdian system for a fixed price, and a MRIdian system will generally not be delivered for nine to 15 months."

98.     The foregoing statements in ¶¶89-97 were materially false and misleading because: (i) Defendants overstated the validity, value, and implied number of the purported orders that the Company actually had in its backlog, as illustrated by, among other things, the large gap between ViewRay's backlog and its revenue 18 months later, and ViewRay's eventual admission that an

34

international distributor could not fulfill its commitments on several orders; and (ii) Defendants

failed to disclose that they included invalid orders in backlog, including under the Company's

stated criteria, involving international distributors that did not have a contract with an end-user

customer, were stale, or had other indicia of unreliability.

99.     On May 2, 2019, ViewRay issued a press release announcing its 1Q19 results,

which was filed with the SEC as part of a Form 8-K.  The press release stated that ViewRay's

revenue for the quarter was $20.3 million, and its net loss was $33.4 million.

100.    The press release contained materially false and misleading statements.  In

particular, it reported that "*[t]otal backlog increased to $237.5 million as of March 31, 2019,*

*from $212.3 million as of December 31, 2018.*"  The Company also reaffirmed its FY19 financial

guidance, stating "*[t]he Company anticipates 2019 total revenue to be in the range of $111*

*million to $124 million, and total cash usage to be in the range of $65-$75 million.*"

101.    Later on May 2, 2019, Defendants held a press conference with securities analysts

during which they made additional materially false and misleading statements regarding

ViewRay's backlog, orders, ability to turn backlog into recognized revenue, and positioning for

success.  Defendant Drake claimed:

> *[T]he installations that we're working on are more or less baked about a year*
> *ahead of time.  So we're still executing on what I would call kind of the legacy*
> *pipeline that the new management team inherited and I feel like that work is*
> *being done in an outstanding way by the team, we have capabilities to do more*
> *installations in parallel now than we did previously, and the work is being done*
> *in a very systematic fashion*, and I think we'll continue to make steady
> improvements throughout 2019.
>
> We are seeing a little more high level, [ ] as you're aware, than what the previous
> team shared in terms of installation timeframes*.  But I would tell you that we have*
> *made very steady progress on a quarterly even monthly basis and that will*
> *continue throughout 2019 and probably in to early 2020, when we'll get to the*

*stated goal that the company has which is, generally speaking, 80% or so of our orders will be able to translate into revenue in a 12-month period of time versus 18 months previously.*

102.    Defendant Bansal also reiterated that "*[a]s of March 31, 2019 our backlog stood at approximately $238 million compared to approximately $212 million at year-end 2018.*"

103.    The Company's 1Q19 Form 10-Q, dated and filed with the SEC on May 3, 2019, and signed by Defendants Drake and Bansal, made materially false and misleading statements about the Company's backlog substantially identical to those made in the 1Q18 Form 10-Q, as cited in ¶59.  The 1Q19 10-Q also stated that "*[a]t March 31, 2019, we had total backlog of $237.5 million.*"[5]

104.    The foregoing statements in ¶¶99-103 were materially false and misleading because: (i) Defendants overstated the validity, value, and implied number of the purported orders that the Company actually had in its backlog, as illustrated by, among other things, the large gap between ViewRay's backlog and its revenue 18 months later, and ViewRay's eventual admission that an international distributor could not fulfill its commitments on several orders; and (ii) Defendants failed to disclose that they included invalid orders in backlog, including under the Company's stated criteria, involving international distributors that did not have a contract with an end-user customer, were stale, or had other indicia of unreliability.

**THE TRUTH BEGINS TO EMERGE**

105.    On August 8, 2019, after the close of trading, ViewRay issued a press release announcing its 2Q19 results and updating its FY19 guidance.  For 2Q19, ViewRay reported a net

---

[5]     The final prospectus for the December 4, 2019 offering incorporates, by reference, the 2018 10-K, 1Q19 Form 10-Q, 2Q19 Form 10-Q, and 3Q19 Form 10-Q, all of which contained materially false and misleading statements.

loss of $30.8 million, or $0.32 per share. ViewRay also disclosed only three new orders in the quarter, totaling $18.1 million, the lowest since 1Q17. Furthermore, ViewRay disclosed that its FY19 revenue guidance fell to between $80 million and $95 million (12-15 systems), well below the $111 million to $124 million (17-19 systems) guidance it had provided on March 14, 2019, and maintained on May 2, 2019. Further, total cash use for FY19 was now expected to be in the range of $80 million to $90 million, up considerably from the prior guidance range of $65 million to $75 million. All of this increased the Company's losses and delayed its purported progression to profitability. Defendants also disclosed that the employment of CFO Bansal would end effective September 30, 2019.

106. The press release also disclosed that backlog had declined somewhat, while fraudulently maintaining that the value remained elevated at $219.3 million, for the reasons set forth above.

107. Later, on August 8, 2019, Defendants held a press conference with securities analysts during which they made other partial disclosures. ViewRay disclosed that the guidance miss was partially due to purported orders for two MRIdian systems involving a foreign distributor that was not able to fulfill those orders. Specifically, Defendant Drake stated, "[f]urther on revenue guidance. ***We have removed 2 other systems due to a distributor potentially not fulfilling their commitment this year.***"

108. Yet, Defendant Drake did not come clean about the full scope of the foreign distributors' inability to fulfill their purported orders and claimed that "[t]here's end customer demand at both the clinical and executive level of these 2 hospitals. We will ensure that we have

the right strategic partner to, not only fulfill these 2 orders, but to address growing demand in this market. We are working to resolve this issue, but are not sure we'll be able to do so by year-end."

109.    Similarly, Defendants did not come completely clean about ViewRay's fraudulently inflated backlog.  Instead, they claimed that the delays were simply timing issues, that those orders would still eventually be filled due to "end-customer demand," and that the Company was now even more confident in its commercial pipeline going forward.  Thus, though Defendants reported that backlog had declined quarter-over-quarter, they only removed one order worth approximately $8 million from the total.  Further, Defendant Drake had the following discussion with an analyst:

> **Anthony Charles Petrone**  Jefferies LLC, Research Division – Equity Analyst
>
> I think there's clearly 3 moving parts here, there's orders, backlog, installations. I think though from a higher level standpoint is, *if we look over the past 90 days, clearly this is nearly a 180 and basically all of those kind of indicators for the business*. So maybe just kind of looking at the past 90 days, *it seems like a confluence of headwinds hit the business*. So maybe just a little bit more on the totality of the change? And then maybe I'll have a couple of individual follow-ups.
>
> **[Defendant] Drake**  ViewRay, Inc. – President, CEO & Director
>
> Yes. Anthony, I would say that in the last 90 days, a few things, number one, I think *the pipeline of commercial activity, which the Street doesn't have visibility to has improved*, the number of customers that we're calling on is higher. The number of multi-system deals is higher, *our ability to, in a few instances, speed customers through the purchasing decision historically 18 to 24 months, we've been able to achieve that more quickly*.
>
> *So I feel better about the overall pipeline than I did previously*.
>
> * * *
>
> [A]nd the final [thing that's a big difference today versus 90 days ago] would be a *distributor that is gone through a management change* is doing some portfolio management work and we're probably going to have to find a new distribution partner in that market and *don't know whether or not we're going to be able to do that quickly enough to satisfy the end-customer demand here in calendar '19.*

*So the 5 systems where revenue is coming down by is not ultimately, whether or not they will be MRIdian Systems in our estimation, it's more of the timing of that* and it's quite possible that those systems will push into 2020 versus taking place in this year and that obviously has an impact on cash consumption.

110.    Analysts on the call expressed "surprise" and "concern" over ViewRay's 2Q19 results.  For example, an analyst at Guggenheim Securities, LLC ("Guggenheim") stated, in relevant part:

*[N]ew orders had been steadily ramping*, you've got probably by some of the volatility, given that the low number of systems that are involved, but *I think the expectation was the changes that you've put in place since you came on board would certainly cause a positive inflection there. So this number is going to strike people as surprising and a bit concerning.*

111.    On this news, the price of ViewRay common stock plummeted approximately 54%, or $3.64 per share, to close at $3.10 per share on August 9, 2019, on unusually high trading volume of more than 26.6 million shares.  However, ViewRay's stock remained artificially inflated due to the materially false and misleading statements that Defendants mixed in with the partial disclosures.

112.    In response to this news, analysts slashed their price targets on ViewRay common stock across the board, citing concerns with the Company's business metrics and financial prospects and questioning the quality of the reported backlog, including:

(a)    Morgan Stanley: price target cut from $7.00 to $5.00 per share, citing "commercial execution" and "profitability headwinds and potentially structural concerns";

(b)    Guggenheim: price target cut from $12.00 to $8.00 per share, noting that "2Q was a disappointing update as ViewRay booked just 3 new system orders for $18.1M (~48% YOY) after averaging $48M in orders over the prior two quarters[,]" while emphasizing that "[t]he more concerning number, in our view, is the slowdown in new

orders as this represents the best proxy for where the business will be from a revenue perspective in 12-18 months";

(c)     Northland Securities Inc. ("Northland"): price target slashed by 75% from the $20.00 per share, set on July 30, 2019, down to just $5.00 per share, stating "man, we are eating crow right now[,]" pointing out that "heightened execution risk is real," and that as such, the firm was "removing [its] foot off the gas pedal."  Northland specifically called out the recent "bulk order win at GenesisCare by [competitor] Elekta[,]" stating that "[e]ven if Elekta had to give massive discounts to entice the bulk order, that would imply that Elekta is ready to play hardball in terms of pricing, which we contend ViewRay lacks" and adding that "[t]hat, in and of itself, introduces a new level of complexity in market analyses";

(d)     BTIG: stated "Weak Orders and Install Delays Cast a Shadow Over VRAY's Near-Term Outlook" and slashed price target from $10.00 to $6.00 per share, noting that "[i]nconsistency in both revenue and orders seems to have unnerved investors";

(e)     Jefferies LLC ("Jefferies"): price target slashed in half from $14.00 to $7.00 per share, emphasizing that "[a]ll that could go wrong went wrong in 2Q: orders fell short @ 3 (JEF 8), top-line guidance was slashed $30mn at midpoint on slower installs in turn driving cash burn $15mn higher at midpoint; to boot the co also announced resignation of CFO in the coming weeks";

(f)     Cantor Fitzgerald Securities ("Cantor"): price target cut by more than 50% from $13.00 down to $6.00 per share, stating that "weak orders, install delays and increased expected cash burn naturally raise concerns"; and

(g)    Piper Jaffray: price target cut 60% from $15.00 down to $6.00 per share, calling the results a "Perplexing Quarter" with "poor backlog growth" and noting that it was "a little disappointed to see so few new systems in the order book" and that "[a]fter several clean quarters of solid installation and order backlog growth, today's result is surprising to say the least[.]"

113.    On November 12, 2019, ViewRay issued a press release announcing its 3Q19 results, which was filed with the SEC as part of a Form 8-K.  The Company's total revenue for the quarter was $20.9 million, generated primarily by three revenue units, and its net loss was $20.8 million, or $0.21 per share.

114.    The press release contained materially false and misleading statements.   In particular, it reported "*[t]otal backlog grew to $230.7 million as of September 30, 2019, compared to $200.9 million as of September 30, 2018*" and "eight new orders for MRIdian systems, including three upgrades, totaling approximately $35 million."

115.    Later on November 12, 2019, Defendants held a press conference with securities analysts during which they made additional materially false and misleading statements regarding ViewRay's backlog, orders, ability to turn backlog into recognized revenue, and positioning for success.  In discussing ViewRay's ability to recognize revenue from its backlog, Drake claimed:

*So to bring down the backlog, it's really in line with what I shared in my prepared remarks. When planning and permitting goes at a good pace, we can move very, very swiftly. And when that's not the case, we are just moving at our customers' pace. So we're trying to make it very clear that we have built the capability set to move quickly, and we will do so when our customers are prepared for that. And when they're not, we don't believe having friction with them, trying to drive it falsely to our time frame is beneficial for long-term relationships. So we're trying to be really clear on one hand that we're well equipped to do it relatively quickly. And on the other hand, we're moving at our customers' pace where we think that's appropriate.*

116.    While explaining the plans for the removal of an order from the backlog, Defendant Drake stated:

> *[R]egarding the system that came out of the backlog, our criteria there is both time-based and activity-based for our assessment on the backlog. So if we just don't like either the time frame or the level of activity happening with that customer, that's when we will take them out of backlog. And that's what happened in this particular instance. To be clear, we still have an order from the customer. And our hope is to make them a MRIdian account. But we're just not satisfied on our criteria, and so they came out this time.*

117.    The Company's 3Q19 Form 10-Q, dated and filed with the SEC on November 12, 2019, and signed by Defendant Drake, made materially false and misleading statements about the Company's backlog substantially identical to those made in the 1Q18 Form 10-Q, as cited in ¶59. The 3Q19 Form 10-Q also stated that "*[a]t September 30, 2019, we had total backlog of $230.7 million*."

118.    The foregoing statements in ¶¶113-17 were materially false and misleading because: (i) Defendants overstated the validity, value, and implied number of the purported orders that the Company actually had in its backlog, as illustrated by, among other things, the large gap between ViewRay's backlog and its revenue 18 months later, and ViewRay's eventual admission that an international distributor could not fulfill its commitments on several orders; and (ii) Defendants failed to disclose that they included invalid orders in backlog, including under the Company's stated criteria, involving international distributors that did not have a contract with an end-user customer.

119.    On January 13, 2020, ViewRay issued a press release with its preliminary results for 4Q19 and FY19.  The Company disclosed that it had generated product revenue of less than $17 million on three units, including one upgrade.  Again, the Company's backlog had not

materialized as investors were led to expect, based on the purported 18-month cycle from order to revenue recognition that Defendants had repeatedly touted.  In addition, the Company announced that it had received only four new orders for MRIdian systems, another low result calling into question the Company's ability to generate orders and add to its backlog.  At the same time, the press release announced that ViewRay's recently appointed Chief Commercial Officer Jim Alecxih ("Alecxih"), who had been brought into the Company to increase sales, would – after only 14 months on the job – be the latest in a string of high ranking officers leaving the Company.

120.    On this news, the price of ViewRay common stock fell over 23%, or $0.895 per share, to close at $2.855 per share on January 13, 2020, on unusually high trading volume of more than 11.6 million shares.

121.    In response, analysts expressed more disappointment with the Company's performance, again citing concerns with its business metrics and positioning for success, and questioning the quality and validity of the reported backlog, including:

(a)    Guggenheim: "[W]e see this 4Q performance as somewhat disappointing, with VRAY still demonstrating inconsistent commercial progress";

(b)    Jefferies (on January 13, 2020): (i) "The readthrough here is clearly negative given [Alexcxih]'s appointment was designed to shift VRAY's go-to-market strategy from its previous high-touch model to employing a broader array of capital access models employed at his prior alma mater Intuitive Surgical (ISRG, NC). With recent order trends (last 3Qs) waning, ***today's announcement on further shifts at the commercial level for VRAY are indicative that the near-term outlook for commercial order flow remains limited*** with further shifts in the go-to-market strategy likely in the works."; (ii) ASPs down

10%; and (iii) "The readthrough here is that although the MR-Linac product cycle is early, the market is dictating that a lower technology acquisition cost is needed in order to make adoption a feasible endeavor particularly through the current clinical data gathering phase the cycle is in the midst of"; and

(c)      Jefferies (on January 21, 2020): "VRAY shares traded off by ~25% following the company's 4Q pre-announcement last week on a combo of: 1) slower orders (actual 4; consensus 6; last year 8); 2) lower realized ASPs on 4Q orders (actual ~$5.2mn vs $5.6-$5.8mn historical trend); and 3) surprise departure of CCO, Jim Alecxih, a little over a year into his appointment. On order flow, we learned that 2 systems slipped from 4Q but are expected to be realized in 1Q; *it is unclear if the slippage related to distributor issues that affected mid-2019 order flow*; however, changes on this front remain under way."

122.    Tellingly, the supposedly delayed revenue did not show up in 2020.  Rather than spiking as the result of $30 million in delayed revenue, the Company's 2020 forecast sank.  On March 12, 2020, the Company announced 2020 revenue estimates of $58-$95 million, significantly below 2019 revenue.

## **LOSS CAUSATION**

123.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class.  During the Class Period, Plaintiff and Class members purchased ViewRay common stock at artificially inflated prices caused by Defendants' misconduct.  The price of the Company's common stock declined significantly when the substantial problems and risks misrepresented and concealed by Defendants

were disclosed and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

124. Before the partial disclosures, on August 8, 2019, and January 13, 2020, investors had been unaware of the following material facts about ViewRay that were known to Defendants throughout the Class Period: (i) Defendants overstated the validity, value, and implied number of the purported orders that the Company actually had in its backlog, as illustrated by, among other things, the large gap between ViewRay's backlog and its revenue 18 months later, and ViewRay's eventual admission that an international distributor could not fulfill its commitments on several orders; and (ii) Defendants failed to disclose that they included invalid orders in backlog, including under the Company's stated criteria, involving international distributors that did not have a contract with an end-user customer.

125. Defendants' misrepresentations and omissions and fraudulent scheme, as alleged above, concealed the true adverse material facts from the market during the Class Period, leading investors to wrongly believe that ViewRay's backlog was not overstated, that the backlog did not include invalid orders involving international distributors, including without an end-user customer, and that the Company was experiencing substantial success, as represented by this (inflated) backlog.

126. As alleged above, these material facts were partially revealed to investors for the first time on August 8, 2019, and further revealed on January 13, 2020. On August 8, 2019, Defendants attributed the Company's poor performance, in part, to an international distributor that could not fulfill its commitment for two orders. Then on January 13, 2020, ViewRay disclosed its preliminary and disappointing results for 4Q19 and FY19, which included low new orders

added to backlog and a continued inability to convert its supposedly large backlog into recognized revenue.

127.    Additionally, these disclosures, which investors learned of on August 8, 2019, and January 13, 2020, were the precise and foreseeable consequences of ViewRay's scheme to manipulate its backlog.  Specifically, because ViewRay's backlog was inflated, the Company could not sustain its purported pace of new orders or convert its purported existing orders into revenue.

128.    Following the August 8, 2019 statements, the market reacted swiftly and negatively.  As a result thereof, by the close of the next trading day, August 9, 2019, the price of ViewRay common stock declined by approximately 54%.  Likewise, following the January 13, 2020 statements, the market reacted swiftly and negatively.  As a result thereof, the price of ViewRay common stock price declined nearly 24% on January 13, 2020.

129.    The timing and magnitude of these precipitous declines in ViewRay's stock price, following the corrective disclosures described above, negates any inference that the loss suffered by investors was caused by changed market conditions, macroeconomic or industry factors, or other facts unrelated to Defendants' fraudulent conduct.  Defendants' false and misleading statements, as set forth above, proximately caused foreseeable losses to investors

## ADDITIONAL ALLEGATIONS OF SCIENTER

130.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

131.    The facts set forth herein, viewed collectively, give rise to a strong inference that the Executive Defendants acted knowingly, or recklessly, when they concealed from the market

the material negative information that, *inter alia*: (i) Defendants overstated the validity, value, and implied number of the purported orders that the Company actually had in its backlog, as illustrated by, among other things, the large gap between ViewRay's backlog and its revenue 18 months later, and ViewRay's eventual admission that an international distributor could not fulfill its commitments on several orders; and (ii) Defendants failed to disclose that they included invalid orders in backlog, including under the Company's stated criteria, involving international distributors that did not have a contract with an end-user customer.

132. ViewRay is a small company. It had only 221 full-time employees as of year-end 2018. The number of orders taken and fulfilled by the Company is an even smaller universe. As of December 31, 2018, ViewRay had installed or delivered 28 MRIdian systems worldwide. Over the last seven quarters, from 2Q18 through 4Q19, the Company added approximately 45 systems to its backlog. Each and every sale is important to the Company's performance.

133. Throughout the Class Period, Defendants emphasized their continual review of the Company's backlog. For example, the Company reviews its backlog every quarter, as stated in the Company's 2018 10-K, and in all of the Company's Class Period 10-Qs, in pertinent part: "We perform a quarterly review of backlog to verify that outstanding orders in backlog remain valid, and based upon this review, orders that are no longer expected to result in revenue are removed from backlog."

134. Moreover, in early 2019, the Company completed a "thorough review" or "scrub" of its "legacy backlog[.]"

135.    As part of the Company's 2018 10-K, ViewRay changed its "New Orders and Backlog" and "Revenue" definitions from the 2017 10-K definitions, demonstrating that they were reviewed and evaluated.

136.    ViewRay emphasized orders and backlog as its most important metrics, continually touting its new orders and purportedly growing backlog.  ViewRay also touted its purported ability to convert backlog to revenue by declaring its installation capacity constraints or lack of such constraints.

137.    As senior executives of a small company with a limited number of orders that were regularly reviewed, and who regularly discussed the backlog and orders with investors, the Executive Defendants had access to the actual concealed information regarding those orders and backlog.  Moreover, given the importance of the orders and backlog to ViewRay, which Defendants repeatedly touted as the core operation and metrics by which to view the Company, Defendants were necessarily aware of that information.

138.    ViewRay had a consistent need for additional operating capital to fund its continued operations, which it had to generate from regular capital raises, including two secondary public offerings during the Class Period in August 2018, at $9.25 per share, and in December 2019, at $3.13 per share.  This was because the Company has operated at a loss since its inception and it operates a cash-intensive business while only generating much lower revenue.  Defendants were accordingly motivated to conceal the full truth, so that their capital raises would result in the necessary proceeds.

139.    Additionally, while Defendants were issuing materially false and misleading statements about the Company's business and concealing negative information, certain insiders

who or which had access to confidential information and were aware of the truth about the Company and its business, were benefitting from this illegal course of conduct by selling large blocks of the Company's stock at artificially inflated prices, without disclosing the materially adverse facts about the Company that they were privy to.  Such sales were unusual in their amount and in their timing.

140.    The following shows the heavy insider sales during the Class Period:

(a)    Defendant Dempsey:

(i)    On July 1, 2019, Defendant Dempsey, founder of ViewRay, sold 5,146 of his personally held shares of ViewRay common stock for $8.63 each, reaping more than $44,000 in gross proceeds.  The sales were unusual as to timing as he had not sold any shares since March 2018.  These were the first sales made by Dempsey pursuant to a purported 10b5-1 plan;[6]

(ii)    Also on July 1, 2019, Defendant Dempsey sold another 21,615 of his personally held shares of ViewRay common stock for $8.64 each, reaping nearly $187,000 in gross proceeds.  The sales were unusual as to timing as he had not sold any shares since March 2018.  These were the first sales made by Dempsey pursuant to a purported 10b5-1 plan;

---

[6]    Prior to the Class Period, Defendant Dempsey had engaged in a single, open market sale of his shares that was not made pursuant to a 10b5-1 plan.  However, starting on July 1, 2019, shortly before the truth of Defendants' misconduct began to be revealed, Defendant Dempsey engaged in four open market sales, all pursuant to a purported 10b5-1 plan.  Defendant Dempsey's 10b5-1 plan is not publicly available as of the date of this filing.

(iii)     Then, on August 1, 2019, Defendant Dempsey sold another 21,615 of his personally held shares of ViewRay common stock for $8.97 each, reaping nearly $194,000 in gross proceeds; and

(iv)     Finally, on September 3, 2019, Defendant Dempsey sold another 272,414 of his personally held shares of ViewRay common stock for $3.57 each, reaping nearly $997,000 in gross proceeds.

(b)     Corporate Insiders:

(i)     Between July 26 and August 8, 2018, just before the August 2018 secondary offering, and when the stock price was at all-time high levels, corporate insider Fmr LLC sold $13.93 million of ViewRay common stock.  As of April 25, 2019, entities affiliated with Fmr LLC (the "FMR Entities") owned 9.97% of ViewRay's outstanding shares of common stock.  FMR Entities are long-time investors in ViewRay.  Beginning in at least 2008, and before the Company went public, FMR Entities invested millions in ViewRay, providing Series B and C financing, as well as other investments.  FMR Entities also purchased over $4 million of ViewRay common stock in the Company's going-public private placement in or around July 2015.  In addition, from 2008 until March 2016, FMR Entities had an affiliate serving as a member of the Company's Board, Robert Weisskoff, Ph.D (except from July 23, 2015 through September 3, 2015); and

(ii)     Between August 4 and August 18, 2018, just before and after the August 2018 secondary offering, and when the stock price was at all-time high levels, corporate insiders OrbiMed Advisors LLC and OrbiMed Capital GP III LLC

(together, "OrbiMed") sold over $31 million of their ViewRay common stock.  As of April 25, 2019, entities affiliated with OrbiMed (the "OrbiMed Entities") owned approximately 10% of ViewRay's outstanding shares of common stock (14.50% as of April 30, 2018).  OrbiMed Entities are long-time investors in ViewRay. Beginning in at least 2008, and before the Company went public, OrbiMed Entities invested millions in ViewRay, providing Series B and C financing, as well as other investments.  OrbiMed Entities also purchased over $4 million of ViewRay common stock in the Company's going-public private placement in or around July 2015.  In addition, from 2008 until June 2018, OrbiMed Entities had an affiliate serving as a member of the Company's Board, David Bonita, M.D.

## PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET

141.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and the other members of the Class purchased ViewRay common stock between the time Defendants misrepresented or failed to disclose material facts and

the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

142. At all relevant times, the market for ViewRay's common stock was efficient for the following reasons, among others:

      (a)    As a regulated issuer, ViewRay filed periodic public reports with the SEC;

      (b)    ViewRay regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

      (c)    ViewRay stock traded on the NASDAQ, an efficient market.

143. As a result of the foregoing, the market for ViewRay securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of ViewRay's securities, at all relevant times, suffered similar injury through their purchases of ViewRay securities at artificially inflated prices and a presumption of reliance applies.

144. In addition, Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated, in part, upon material omissions of fact that Defendants had a duty to disclose.

### INAPPLICABILITY OF STATUTORY SAFE HARBOR
### AND BESPEAKS CAUTION DOCTRINE

145. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this complaint.

Many of the specific statements described herein were not forward-looking and were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of ViewRay who knew that those statements were false or misleading when made.

## CLASS ACTION ALLEGATIONS

146.    Plaintiff brings this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, ViewRay securities during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have, or had, a controlling interest.

147.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ViewRay common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds

or thousands of members in the proposed Class.  Millions of ViewRay shares were traded publicly during the Class Period on the NASDAQ.  Record owners and the other members of the Class may be identified from records maintained by ViewRay or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

148.    Plaintiff's claims are typical of the claims of Class members who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.  Further, Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

149.    Common questions of law and fact exist, as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants omitted and/or misrepresented material facts;

(c)    whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(d)    whether the price of ViewRay common stock was artificially inflated; and

(e)    the extent of damage sustained by Class members and appropriate measure of damages.

150.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of §10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

151.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

152.    This count is asserted on behalf of all members of the Class against all Defendants for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

153.    These Defendants carried out a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and the other members of the Class to purchase ViewRay's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, each of these Defendants took the actions set forth herein.

154.    During the Class Period, these Defendants disseminated or approved the false statements specified herein, among others, which they knew or deliberately disregarded were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

155.    These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make

the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ViewRay securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

156.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of ViewRay, as specified herein.

157.    As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

158.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ViewRay securities was inflated or maintained at artificial levels throughout the Class Period.  In ignorance of the fact that market prices of ViewRay's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other members of the Class purchased or acquired ViewRay securities at artificially inflated prices.

159.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their ViewRay stock or, if they had acquired such securities, would not have done so at the artificially inflated prices that they paid.

160.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their transactions in ViewRay stock during the Class Period, when the artificial inflation in the price of such securities dissipated, as the truth regarding Defendants' conduct was revealed, causing the price of ViewRay stock to decline and resulting in economic losses to Plaintiff and the Class.

161.     By virtue of the foregoing, these Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and they are liable to Plaintiff and the Class for damages suffered in connection with their transactions in ViewRay common stock during the Class Period.

162.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to this action.

## COUNT II
### Violation of §20(a) of the Exchange Act
### (Against the Executive Defendants)

163.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

164. The Executive Defendants acted as controlling persons of ViewRay within the meaning of §20(a) of the Exchange Act, as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false and misleading. The Executive Defendants were provided with, or had access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

165. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercise same.

166. As set forth above, ViewRay and the Executive Defendants each violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions, as alleged herein.

167. By virtue of their positions as controlling persons, the Executive Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities.

168.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Fed. R. Civ. P. 23 and appointing Plaintiff's counsel as Lead Counsel for the Class;

B.    Awarding compensatory damages in favor of Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  September 2, 2020

SCOTT+SCOTT ATTORNEYS AT LAW LLP

 */s/ Thomas L. Laughlin, IV*
Thomas L. Laughlin, IV (*pro hac vice*)
Max R. Schwartz (*pro hac vice*)
Donald A. Broggi (*pro hac vice*)
Rhiana L. Swartz (*pro hac vice*)
Randy Moonan (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10174
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
tlaughlin@scott-scott.com
mschwartz@scott-scott.com

dbroggi@scott-scott.com
rswartz@scott-scott.com
rmoonan@scott-scott.com

Geoffrey M. Johnson (OH 0073084)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile:  (216) 229-6092
gjohnson@scott-scott.com

*Counsel for Lead Plaintiff Plymouth County*
*Retirement Association and Proposed Lead*
*Counsel for the Class*