## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PLYMOUTH COUNTY RETIREMENT ASSOCIATION, *et al.*, | ) ) ) ) | Case No. 1:19-cv-2115 |
| | | Judge J. Philip Calabrese |
| Plaintiffs, | ) ) | Magistrate Judge David A. Ruiz |
| v. | ) ) | |
| VIEWRAY, INC., *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

### OPINION AND ORDER

Defendant ViewRay, Inc., is a small medical device company that manufactures MRI-guided radiation systems used to locate, target, and treat cancer. Plaintiff Plymouth County Retirement Association purchased ViewRay common stock on the NASDAQ stock exchange.  After ViewRay's stock price dropped in late 2019, Plaintiff sued ViewRay and various current and former executives for securities fraud.  Defendants move to dismiss (ECF No. 59) the second amended complaint (ECF No. 55).  For the reasons discussed below, the Court **GRANTS** Defendants' motion and **DISMISSES** the second amended complaint.

### STATEMENT OF FACTS

Taking the facts alleged in the second amended complaint as true and construing them in favor of the non-moving party, Plaintiff bases its claims in this putative class action on the following facts.

### A.    ViewRay's Business and Products

ViewRay manufactures and markets the Linac MRIdian, which uses magnetic resonance imaging technology paired with a radiation beam to image and treat cancer at the same time.  (ECF No. 55, ¶ 30, PageID #1262.)  This product represents an upgrade over an earlier first-generation product and uses a more advanced linear accelerator, which irradiates cancer cells with less collateral damage.  (*Id.*)  Various overseas regulatory authorities approved the MRIdian device between 2016 and 2018, and the Food and Drug Administration approved it for use in the United States in February 2017.  (*Id.*)  Nearly all of ViewRay's revenue relates to the sale of MRIdian systems.  (*Id.*, ¶ 31.)

An MRIdian system costs approximately $6 million and is substantially more expensive than some competing systems that provide radiation therapy without the MRI feature that distinguishes ViewRay's product.  (*Id.*, ¶ 32, PageID #1262–63.)  By the same token, however, a comparable competitive product that combines radiation therapy and MRI sells for about the same price.  (*Id.*)  Typically, a customer needs between nine and fifteen months to prepare its facility to house an MRIdian system— a concept referred to as vault readiness.  (*Id.*, ¶ 36, PageID #1264.)  Installation and calibration take an additional sixty to ninety days.  (*Id.*, PageID #1265.)  For ViewRay, the time between placement of an order to completion of installation, at which point the company recognizes revenue from the transaction for accounting purposes, takes between twelve and eighteen months.  (*See id.*; *id.*, ¶¶ 37 & 38.)

In July 2015, ViewRay went public through a reverse merger and private placement and trades on the NASDAQ under the symbol "VRAY."  (ECF No. 55, ¶¶ 2,

19, 28, PageID #1253, 1259, 1262.)  Since going public, ViewRay sought to raise capital on several different occasions through various private, semi-private, and public offerings of common stock.  (*See id.*, ¶¶ 33–33e.)  In July, November, and December 2019, Plymouth purchased ViewRay common stock on the open market at prices ranging from $9.46 per share (on July 19, 2019) to $3.13 (on December 4, 2019).  (*See* ECF No. 28, PageID #426.)

## B.    ViewRay's Officers and Directors

The second amended complaint names the following ViewRay officers and directors as Defendants:

*President and CEO.*  Since June 24, 2018, Scott Drake has served as ViewRay's President and Chief Executive Officer and holds a seat on its board of directors.  (ECF No. 55, ¶ 21, PageID #1259.)

*Chief Financial Officer.*  From June 8, 2016, until his departure from the company on September 30, 2019, Ajay Bansal was ViewRay's Chief Financial Officer. (*Id.* at ¶ 22, PageID #1259–60.)

*Chief Scientific Officer.*  James Dempsey founded ViewRay and serves as the company's Chief Scientific Officer; he also sits on its board.  (*Id.* at ¶ 23, PageID #1260.)

*Chief Operating Officer.*  Since June 24, 2018, Shahriar Matin has been ViewRay's Chief Operating Officer.  (*Id.*, ¶ 25, PageID #1261.)

*Former President and CEO.*  From February 4, 2013, until July 22, 2018, Chris Raanes served as ViewRay's President and Chief Executive Officer and as a member of the board.  (*Id.* at ¶ 24, PageID #1260.)

### C.     The Allegedly Fraudulent Scheme

According to the second amended complaint, ViewRay, as an early-stage company struggling to generate revenue and turn a profit, touted to the market a large number of MRIdian orders—the backlog—that promised a stream of revenue in the foreseeable future.  (*Id.*, ¶¶ 3, 40, PageID #1254, 1266.)  Plaintiff alleges that ViewRay emphasized its backlog as "the true marker of the Company's success," and notes that several analysts identified the backlog of orders as a critical focus for investors.  (*Id.*, ¶¶ 40 & 41–42, PageID #1266–67.)

In their filings with the Securities and Exchange Commission and on earnings calls with analysts throughout the class period, ViewRay often discussed the backlog. For example, Mr. Drake said during the 1Q18 earnings call that "orders is a big [measure of progress] and we're shining a bright light on that internally . . . and with investors" and that "the most import[ant] metric to me in 2019 is orders is because that's what we can impact."  (*Id.*, ¶ 40, PageID #1266.)  ViewRay repeatedly stated it was "scaling up [its] ability to secure new orders and install more systems simultaneously," while also reducing installation time from sixty-to-ninety days down to thirty or forty.  (*Id.*, ¶ 72, PageID #1278.)  By March 31, 2018, ViewRay valued its backlog at roughly $195 million, a nearly $50 million increase from the same time the previous year.  (*Id.*, ¶¶ 71–72, PageID #1277–78.)

According to ViewRay's 1Q18 Form 10-Q, the company kept its backlog up to date by performing a "quarterly review of backlog to verify that outstanding orders in backlog remain valid" and by removing "orders that are no longer expected to result in revenue."  (*Id.*, ¶ 73, PageID #1278–79.)  Notwithstanding these reported efforts to

4

update the backlog and remove "aging and some of the nonprogress" orders, for the most part the backlog was "fairly current" and "fairly sticky," meaning that the orders were likely to turn into completed sales.  (*Id.*, ¶ 78, PageID #1280.)

By September 30, 2018, ViewRay valued its backlog at approximately $200 million.  (*Id.*, ¶ 84, PageID #1282 (quoting 3Q18 Form 10-Q).)  And on January 7, 2019, ViewRay reported its "backlog grew to $212 million," even after it removed three systems from the backlog following its quarterly review.  (*Id.*, ¶ 86, PageID #1282–83.)  As for revenue, at a JPMorgan Global Healthcare Conference in January 2019, Mr. Drake stated that he had "confidence that [the company] would be able to install what's forthcoming in 2019 and recognize revenue."  (*Id.*, ¶ 87, PageID #1283–84.)  On March 14, 2019, in its FY18 Form 8-K, ViewRay predicted revenue for FY19 would be "in the range of $111—$124 million." (*Id.*, ¶¶ 89, 90, PageID #1284.)

On July 19, 2019, Plymouth made its first purchase of ViewRay stock, buying 19,877 shares for $9.46 per share; less than two weeks later it bought 8,905 more shares for $9.08 per share.  (ECF No. 28, PageID #426.)

### D.    ViewRay Revises Its 2019 Financial Guidance

A few days after Plymouth's second stock acquisition, ViewRay began to temper revenue expectations.  (ECF No. 55, ¶ 105, PageID #1288–89.)  A short time later, ViewRay reported a $30.8 million loss, while simultaneously adding only three new orders to the backlog.  (*Id.*)  It also cut its revenue target from the previous range of $111 million to $124 million, down to between $80 million and $95 million.  (*Id.*)  Despite this revision, ViewRay reported its backlog was holding at $219.3 million.

(*Id.*, ¶ 106, PageID #1289.)  During a press conference later that same day, ViewRay disclosed to analysts that it had removed two orders from an overseas distributor from the backlog.  (*Id.*, ¶ 107, PageID #1289.)  The following trading day, ViewRay's stock price slid 54%, closing at $3.10 per share.  (*Id.*, ¶ 111, PageID #1291.)  Analysts then began revising and lowering their earnings-per-share targets for the company. (*See id.*, ¶¶ 112–112(g), PageID #1292–93).

On November 12, 2019, ViewRay filed its 3Q19 Form 8-K, reporting total revenue of $20.9 million, but losses of $20.8 million, resulting in profits of just $0.21 per share.  (*Id.*, ¶ 113, PageID #1293.)  ViewRay continued to maintain, however, that the backlog was both stable and increasing, growing to $230.7 million as of September 30, 2019—a $30 million increase from the same time the year before.  (*Id.*, ¶ 114, PageID #1293.)

A week later, on November 19, 2019, Plymouth made its single largest acquisition of ViewRay stock, purchasing 34,116 shares at a price of $2.88 per share. (ECF No. 28, PageID #426.)  It bought another 11,364 shares on December 3, 2019 at $4.51 per share and, in its final acquisition, 3,636 shares on December 4, 2019 at $3.13 per share.  (*Id.*)  In total, Plymouth purchased 77,898 shares of ViewRay stock at a total price of just under $430,000 at prices per share ranging from a low of $2.88 to a high of $9.46.  (*Id.*)

On January 13, 2020, ViewRay released 4Q19 and FY19 results, disclosing that it had generated less than $17 million in revenue and received only four new orders.  (*Id.*, ¶ 119, PageID #1294–95.)  Analysts were again disappointed.  (*See id.*,

6

¶¶ 121–121(c), PageID #1295–96.)  ViewRay's stock declined roughly 23%, closing at $2.85 per share.

## STATEMENT OF THE CASE

Plymouth allegedly suffered losses as the share price fell throughout 2019. (ECF No. 55, ¶ 123, PageID #1296–97.)  Plaintiff alleges that ViewRay (and its officers and directors named as Defendants) committed securities fraud by telling investors one thing about its backlog—the key metric underpinning the company's valuation in the absence of revenues and profits—while internally having knowledge or taking actions regarding backlogged orders inconsistent with those public statements.  Plaintiff bases its claims on alleged material misrepresentations or omissions in several statements in various 10-Qs, 10-Ks, 8-Ks, press releases, presentations, and on earnings calls.  As lead Plaintiff, Plymouth alleges Defendants violated Section 10(b) and Rule 10b-5 of the Exchange Act (Count 1) and that the officers and directors, as controlling persons of the company, each violated Section 20(a) of the Exchange Act (Count 2).  (ECF No. 55, ¶ 151–68, PageID #1307–11.)  Plaintiff seeks compensatory damages.  (*Id.*, ¶ B, PageID #1311.)

Plaintiff brings this case under Rule 23, on behalf of a putative class of "all persons and entities that purchased, or otherwise acquired, ViewRay securities." (*Id.*, ¶ 146, PageID #1305.)  Plaintiff defines the class period as running from May 10, 2018 to January 13, 2020.  (*Id.*, ¶ 1, PageID #1253.)

## GOVERNING LEGAL STANDARDS

The Court evaluates Defendants' motion to dismiss Plaintiff's complaint for securities fraud under three different standards.

## I.      Rule 8

In any civil action, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim.  *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. American Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)).  A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability."  *Twombly*, 550 U.S. at 555.

When analyzing a complaint under this standard, the Court construes factual allegations in the light most favorable to the plaintiff, accepts them as true, and draws all reasonable inferences in the plaintiff's favor.  *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015).  But a pleading must offer more than mere "labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading as factual allegations[.]"  *Eidson v. Tennessee Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

Therefore, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not be.  *See Iqbal*,

8

556 U.S. at 628 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up); *see also, e.g.*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (determining that because some of the plaintiff's factual allegations were "not well-pleaded[,]" "their conclusory nature 'disentitles them to the presumption of truth'"). Rule 8, to say nothing of the Private Securities Litigation Reform Act, "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

## II.     Rule 9(b)

In addition, fraud claims must meet Rule 9(b)'s heightened pleading standard. That Rule requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To satisfy this Rule, 'the plaintiff, at a minimum, must allege the time, place, and content of the alleged misrepresentation; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 760 (N.D. Ohio 2020) (cleaned up) (quoting *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012)). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## III.    Private Securities Litigation Reform Act

Under the Private Securities Litigation Reform Act of 1995, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity giving rise to a strong inference that the defendant acted with the

required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 312 (2007); *Doshi v. General Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016). Also, the Reform Act requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *In re TransDigm Grp.*, 440 F. Supp. 3d. at 760.

Where a plaintiff fails to meet these standards, "the court shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). In determining whether to dismiss, courts consider not only the complaint, but also "plausible opposing inferences" that favor the defendant. *Doshi*, 823 F.3d at 1039 (citation and quotation omitted). The Reform Act's requirements are intended to be an "elephant-sized boulder" in the way of private securities fraud cases. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014) ("*Omnicare III*").

## ANALYSIS

Defendants argue Plaintiff fails to state a claim under Section 10(b) and Rule 10b-5 because the second amended complaint does not (1) allege materially false or misleading statements or omissions, (2) allege facts that give rise to a strong inference of scienter, or (3) plead loss causation. As for the Section 20(a) claims against each of the individual officers and directors, Defendants maintain those claims rise and fall with the other. Accordingly, Defendants seek dismissal of the second amended complaint in its entirety. Plaintiff counters that it has adequately

pled actionable misrepresentations and omissions, as well as facts that give rise to a strong inference of scienter on the part of each Defendant.

## I.    Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for anyone to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors."  15 U.S.C. § 78j(b). To enforce this statute, the SEC promulgated Rule 10b-5, which makes it "unlawful to, among other things, 'make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

"The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)." *SEC v. Zanford*, 535 U.S. 813, 816 n.1 (2002) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976)).  Plymouth knows the Reform Act pleading requirements well.  *See, e.g.*, *Plymouth Cnty. Ret. Assoc. v. Advisory Board Co.*, 370 F. Supp. 3d 60, 97 (D.D.C. 2019) (granting in large part defendant's motion to dismiss Plymouth's claims under Section 10(b) and Rule 10b-5); *Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525 (M.D.N.C. 2013); *Plymouth Cnty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360 (E.D.N.Y. 2008).

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must sufficiently allege: "(1) a material misrepresentation or omission by

the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx*, 563 U.S. at 37–38 (quotation and citation omitted); *see Omnicare III*, 769 F.3d at 469. Based on the "text and purpose of § 10(b)," Supreme Court precedent permits an implied "private cause of action" under this statute. *See Matrixx*, 563 U.S. at 37. But what Section 10(b) and Rule 10b-5 do not create is "an affirmative duty to disclose any and all material information." *Id.* at 44. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

Plaintiff identifies some forty statements it maintains were material and false or that omitted material information Defendants were required to disclose. Because the second amended complaint references numerous SEC filings, press conferences, and earnings calls, and they are central to the claims at issue, the Court can consider them without converting the motion to dismiss to one for summary judgment. Indeed, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on a Rule 12(b)(6) motion to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Tellabs*, 551 U.S. at 322–23 (citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007)); *see also Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016). Accordingly, the Court declines to convert the motion to one for

summary judgment and will analyze the statements and omissions at issue in their full context.

### I.A.   Misrepresentations and Omissions

"Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things:  (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact."  *Omnicare III*, 769 F.3d at 470. What is required of a plaintiff changes based on whether they allege an "affirmative misrepresentation, as opposed to omissions," and whether the misrepresentation or omission "contains hard, as opposed to soft, information."  *Id.*

"The [Reform Act] mandates that," to survive a motion to dismiss, Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularly all the facts on which the belief is formed."  *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004) (citing 15 U.S.C. § 78u-4(b)(1)); *see Omnicare III*, 769 F.3d at 480 n.6.

*Misrepresentations.*  "A misrepresentation is an affirmative statement that is misleading or false."  *Omnicare III*, 769 F.3d at 470.  Misrepresentations may contain either hard or soft information.   Hard information usually concerns "historical information or other factual information that is objectively verifiable."  *Id.*  That type of statement may be actionable where "a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading."

*Id.*  Misrepresentations containing soft information "add[] a subjective inquiry to an otherwise objective element" and "include predictions and matters of opinion."  *Id.*  At this first step, the Court determines whether statements are in fact actionable misstatements and, if so, whether they were material, nothing more.  *Id.*  Whether the defendants made those statements with knowledge of their falsity is reserved for the scienter analysis.  *Id.* at 471.

*Omissions.*  Omissions may be actionable in two circumstances:  where a company has an affirmative duty to disclose (for example, when an insider trades or a statute requires disclosure), or where a company makes "an inaccurate, incomplete, or misleading prior disclosure" that it must then correct.  *Id.* at 471 (citing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005)).  In the latter circumstance, a person has a duty to disclose hard information it may receive "if it renders a prior disclosure objectively inaccurate, incomplete, or misleading."  *Id.* (citing *Zaluski*, 527 F.3d at 576).  If "new information is soft, then a person or corporation has a duty to disclose it only if it is virtually as certain as hard facts and contradicts the prior statement."  *Id.* (cleaned up).

At bottom, where a person chooses to speak, federal securities laws "require an actor to 'provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.'"  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (en banc) (quoting *Rubin v. Schottenstein*, 143 F.3d 263, 268 (6th Cir. 1998)).  But a misstatement or omission is only actionable if a reasonable investor would have viewed the information as "alter[ing] the total mix of information

14

available" to the market.  *Basic*, 485 U.S. at 232.  "[V]ague, soft, puffing statements or obvious hyperbole" of "corporate optimism[,]" which can be either "forward looking" or generalized to the point they are "not capable of objective verification," cannot form the basis of a Section 10(b) claim.  *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004).

> [F]ederal courts everywhere have demonstrated a willingness to find immaterial as a matter of law certain kinds of rosy affirmation heard from corporate managers and numbingly familiar to the marketplace— loosely optimistic statements that are so vague, [and] so lacking in specificity, . . . that no reasonable investor could find them important to the total mix of information available.

*Id.* at 570–71 (quotations omitted).

Similarly, where sufficient forward-looking cautionary language accompanies affirmative statements, the "bespeaks caution" doctrine renders predictions of business results immaterial as a matter of law.  *See In re Donald J. Trump Casino Sec. Litig.—Taj Mahal Litig.*, 7 F.3d 357, 371–73 (3d Cir. 1993).  That is, "forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors."  *Id.* at 371.  This doctrine, "as an analytical matter, equally appli[es]" to both "affirmative misrepresentations and omissions concerning soft information."  *Id.* Applying the doctrine depends on the specific communication at issue and requires a case-by-case analysis.  *Id.*

Generally, the alleged misrepresentations and omissions Plaintiff maintains are actionable fall into three categories:  (1) statements about the backlog and the

criteria for orders included in it, (2) statements about the backlog's value, and (3) ViewRay's 2019 revenue guidance.

### I.A.1. Statements About Backlog Criteria

Plaintiff alleges that ViewRay's statements regarding the criteria for including orders in its backlog were false.  These statements and omissions generally fall into three categories.

### I.A.1.a. Backlog Criteria

According to the second amended complaint, ViewRay touted its backlog but failed to follow its publicly stated criteria for including orders in it.  That failure made the statements false or misleading, Plaintiff claims.  Discussion of the backlog criteria often came in ViewRay's disclosure documents.  For example, in the 1Q18 Form 10-Q, ViewRay provided a fair amount of detail about the orders it includes in the backlog and the criteria by which it decides whether to include an order in the backlog:

> The determination of backlog includes objective and *subjective judgment* about the likelihood of an order contract becoming revenue.  We perform a quarterly review of backlog to verify that outstanding orders in backlog remain valid, and based upon this review, orders that are no longer expected to result in revenue are removed from backlog.  *Among other criteria we use to determine whether a transaction to be in backlog*, we must possess both an outstanding and effective written agreement for the delivery of a MRIdian signed by a customer with a minimum customer deposit or a letter of credit requirement*, except when the sale is to a customer where a deposit is not deemed necessary or customary* (i.e. sale to a government entity, a large hospital, group of hospitals or cancer care group that has sufficient credit, sales via tender awards, or indirect channel sales that have signed contracts with end-customers).  We decide whether to remove an order from our backlog by evaluating the following criteria: changes in customer or distributor plans or financial conditions; the customer's or distributor's continued intent and ability to fulfill the order contract; changes to regulatory requirements; the status of regulatory approval required in the customer's jurisdiction, if any; *and other reasons for potential cancellation* of order contracts.

16

(ECF No. 60-9, PageID #1594–95 (emphasis added); ECF No. 55, ¶ 73, PageID #1278–79.) On the surface, Plaintiff's allegation that ViewRay failed to follow these criteria and misled the market appears fairly straightforward. But the italicized language in the statement advises that counting an order in the backlog includes a "subjective judgment" and criteria beyond those listed.

Plaintiff also overlooks the cautionary language that precedes this particular disclosure:

> New orders are defined as the sum of gross product orders, representing MRIdian contract price, recorded during the period. Backlog is the accumulation of all orders for which revenue has not been recognized and which we consider valid. Backlog includes customer deposits or letters of credit, except when the sale is to a customer where a deposit is not deemed necessary or customary. Deposits received are recorded as customer deposit, which is a liability on the balance sheet. Orders may be revised or cancelled according to their terms or upon mutual agreement between the parties. Therefore, it is difficult to predict with certainty the amount of backlog that will ultimately result in revenue.

(ECF No. 60-9, PageID #1594–95.) Plainly, ViewRay advises that "it is difficult to predict with certainty the amount of backlog that will ultimately result in revenue." (*Id.*) Beyond the cautionary language, this language identifies contract-by-contract considerations that affect the inclusion of orders in the backlog.

Similarly, Plaintiff bases its claims on statements ViewRay made in its annual disclosure documents, which were "substantially identical to" those made in other quarterly disclosures, and alleges that the company did not follow the criteria it identified for including orders in backlog. (*See, e.g.*, ECF No. 55, ¶ 95, PageID #1286 (discussing the FY18 Form 10-K).) In its Form 10-K for 2018, for example, ViewRay identifies criteria similar to those identified above:

17

> We evaluate our backlog at least quarterly to determine if the orders continue to meet our criteria for inclusion in backlog.  We may adjust our reported backlog to account for any changes in:  customer or distributor plans or financial conditions; the customer's or distributor's continued intent and ability to fulfill the order contract; regulatory requirements; the status of regulatory approval required in the customer's jurisdiction (or other factors); or due to changes in our judgment about the likelihood of completing an order contract.

(ECF No. 60-20, PageID #1718; ECF No. 55, ¶ 96, PageID #1268.)   Again, this statement includes "changes in our judgment" about the likelihood of an order turning into revenue.  (*Id.*)

Contrary to Plaintiff's argument, ViewRay disclosed its criteria for including orders in the backlog and sufficiently identified discretion and judgment as factors.  At bottom, the publicly disclosed criteria advised the market that ViewRay periodically removed orders from backlog and cautioned that determining when or how much of the backlog would turn into revenue presented a difficult exercise.  Even drawing inferences in favor of Plaintiff, these allegations in the second amended complaint fail to state a claim.

### I.A.1.b.        Sham Orders

Plaintiff alleges ViewRay maintained sham orders in the backlog that were not going to result in profit.  Plaintiff points to alleged misstatements relating to eight such orders in the second amended complaint.  (*See* ECF No. 62, ¶¶ 47–67, PageID #1851–53; *see also* ECF No. 62, PageID #1846.)   Factual support for these invalid orders includes statements from several confidential witnesses, including senior ViewRay officials.  (*See* ECF No. 55, ¶¶ 50–64, PageID #1272–76.)   For example, Plaintiff alleges that Confidential Witness One "observed that . . . it was possible for

the intended end-customer to 'back out.'"  (*Id.*, ¶ 52, PageID #1272.)  Confidential Witness Two was "concerned about the fact that orders had been in the backlog for extended periods of time and/or were tied to customers who had expressed inability to move forward . . . within a reasonable amount of time."  (*Id.*, ¶ 57, PageID #1274).  Confidential Witness Three maintained that the top leadership at ViewRay was consistently updated about the backlog.  (*See id.*, ¶¶ 63–64, PageID #1275–76.)

Examination of the statements from these confidential witnesses, not Plaintiff's argument about them, shows that they fail to state facts supporting a claim that any order in particular was invalid.  For example, even crediting Confidential Witness Two, who purportedly heard from an unnamed sales director that an unnamed university decided not to proceed with the purchase of an MRIdian system, the second amended complaint contains no allegation that the order at issue remained in the backlog.  (*Id.*, ¶ 58, PageID #1274.)  Nor does the second amended complaint sufficiently identify facts to support these allegations.  *See In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp. 2d 751, 758 (N.D. Ohio 2003); *see also* 15 U.S.C. § 78u-4(b)(1).

### I.A.1.c.        The Overseas Distributor Issue

Plaintiff also alleges there were significant issues with ViewRay's operations overseas, with foreign markets accounting for "two-thirds of ViewRay's business and backlog."  (ECF No. 55, ¶ 49, PageID #1271.)  Plaintiff alleges ViewRay "frequently did not have contracts with customers" but rather its distributors placed "placeholder orders" that ViewRay included in its backlog calculations.  (*Id.*)  Additionally, Plaintiff relies on a "damning" admission by ViewRay that the company "clearly did

say that a distributor order only went into the backlog if there was a contract with an end-user." (ECF No. 55, ¶ 49, PageID #1271–72.)

Notably, the second amended complaint does *not* explain why these orders are invalid under ViewRay's criteria.  But the criteria did not tie placing an order in the backlog to a contract between a distributor and an end-user.  Those criteria address waiving a deposit for "indirect channel sales that have signed contracts with end-customers."  (ECF No. 60-9, PageID #1594–95; ECF No. 55, ¶ 73, PageID #1278–79.)  Contrary to Plaintiff's claim, however, that criterion does not place an order into the backlog *only if* a distributor has a contract with a customer.  Even then, the criteria left sufficient judgment and discretion for ViewRay to include such an order in backlog or remove it based on particular facts and circumstances.

Further, Plaintiff argues that ViewRay "put sham orders in the backlog where there was no end-customer" at all.  (ECF No. 62, PageID #1852.)  Assuming the truth of these allegations and construing them in Plaintiff's favor, the second amended complaint fails to state a claim.  Although a distributor may have maintained orders even after a customer backed out, without more that allegation fails to plead that ViewRay had any reason to believe the distributor would not take delivery.  Even if it did, the second amended complaint fails to state facts with any particularly, omitting specific distributors and orders or whether a deposit accompanied distributor orders generally or specifically, among other shortcomings.

### I.A.2. Statements About Backlog Value

Plaintiff argues that ViewRay's disclosures about the backlog's value are false or misleading because the total value included orders that were either unlikely to

come to fruition or completely fabricated.  (ECF No. 62, PageID #1849–56 (citing ECF No. 55, ¶¶ 7, 11, 47–48, 72–73, 78–79, 82–84, 87, 90–93, 95, 99–103, PageID #1255, 1257, 1269–71, 1278–88).)  These citations reference numerous disclosure documents addressing the value of the backlog at various points in time.  For example, ViewRay stated in an exhibit to its May 8, 2018 Form 8-K that "[t]otal backlog grew year over year to $195 million, as of March 31, 2018, up from $144.9 million as of March 31, 2017."  (ECF No. 60-7, PageID #1572.)  ViewRay made similar statements in other filings.[1]  ViewRay's officers (and Mr. Bansal, in particular) reiterated these numbers to analysts on earnings calls (see, e.g., ECF No. 60-8, PageID #1581), as was a common practice for the company (see ECF No. 60-14, PageID #1638 (Nov. 8, 2018 Earnings Call); ECF No. 60-19, PageID #1699–1700 (Mar. 14, 2019 Earnings Call); ECF No. 60-22, PageID #1740 (May 2, 2019 Earnings Call).)

The parties stake out markedly different positions regarding these valuations. Defendants argue that these statements about the backlog's worth are estimates and opinions and, therefore, evaluated under the standard for soft information.  (ECF No. 59-1, PageID #1432.)  To support this position, they point the Court to two cases: the Supreme Court's decision in *Omnicare* and a case from the Southern District of

---

[1] *See* ECF No. 60-10, PageID #1601 (Ex. 99.1 to Aug. 3, 2018 Form 8-K); ECF No. 60-12, PageID #1263 (2Q18 Form 10-Q); ECF No. 60-13, PageID #1629 (Ex. 99.1 to Nov. 8, 2018 Form 8-K); ECF No. 60-15, PageID #1654 (3Q18 Form 10-Q); ECF No. 60-16, PageID #1662 (Ex. 99.1 to Jan. 7, 2019 Form 8-K); ECF No. 60-18, PageID #1683 (Ex. 99.1 to Mar. 14, 2019 Form 8-K); ECF No. 60-20, PageID #1711 (FY18 Form 10-K); ECF No. 60-21, PageID #1731 (Ex. 99.1 to May 2, 2019 Form 8-K); ECF No. 60-22, PageID #1755 (1Q19 Form 10-Q).

New York, *In re Pretium Resources Inc. Securities Litigation*. (*See id.* (citations omitted)).  Defendants also argue the estimates amount to a subjective belief about the value of the backlog.  (*Id.*, PageID #1433.)  They assert the second amended complaint is deficient because "the Court cannot reasonably conclude that Defendants did not subjectively believe the backlog estimates."  (*Id.*)

Plaintiff disagrees.  It argues that because Defendants did not follow their own criteria regarding which orders were properly included in the backlog statements about the value of the backlog itself are also actionable misstatements.  (ECF No. 62, PageID #1853–54.)  Further, Plaintiff argues that the speaker's subjective belief presents only one way to assert an actionable omission and that it has adequately alleged that the other two—opinions of fact with embedded misstatements or omissions—render ViewRay's statements misleading.  (*See id.*, PageID #1854–55.) Also, Plaintiff argues that the "divergence between [ViewRay's] misstatements regarding that criteria and the negligible criteria they actually used" is material "because [ViewRay was] including sham orders in [its] backlog among other invalid orders that had no reasonable expectation of converting into revenue, and were in any event far less likely to do so than the stated backlog criteria indicated."  (*Id.* at PageID #1855 (citing ECF No. 55, ¶¶ 49–67, PageID #1271–77).)

ViewRay's criteria for inclusion in the backlog involve some degree of judgment and discretion.  But that does not make them soft information or a matter of opinion, as Defendants maintain.  Either ViewRay had commitments for a certain number of sales of MRIdian systems worth a certain number of dollars, or it did not.  Statements

22

about the value of the backlog may prove false or misleading even if the company did not ignore its own criteria and include orders in the backlog that it should not have. For example, an officer may have changed the calculations rolling up into the valuation of the backlog, the company may have reviewed a particular order, determined including in the backlog was not appropriate, but included it anyway, or the valuations may be inaccurate for other reasons.

To the extent Plaintiffs argue the hard numbers themselves constitute actionable misstatements under Section 10(b), no factual allegation in the second amended complaint suggests or implies that ViewRay's math was incorrect.  On this point, the confidential witnesses provide no help.  None offers anything more than mere generalities about the backlog, the criteria by which orders are removed or included, and the general workings of the company.

Beyond that, Plaintiff's argument about the value of the backlog devolves into circularity and, essentially, restates its complaint that the backlog includes invalid orders and orders that do not comply with the company's criteria.  Indeed, Plaintiff argues "Defendants' statements regarding the value of the backlog contained the embedded misrepresentation of fact that the orders in the backlog complied with the stated backlog criteria. . . . Similarly, it was misleading to provide backlog estimates while 'omitting' the Company's failure to comply with the criteria."  (ECF No. 62, PageID #1854.)

Under the heightened standards Plaintiff must meet under Rule 9(b) and the Reform Act, the second amended complaint fails to measure up and provide factual

23

allegations beyond mere generalities that Defendants' statements or omissions about the value of the backlog were false or misleading.  To the extent Plaintiff's argument goes to scienter, the Court addresses it separately below.

### I.A.3. Revenue Guidance and Revisions

Plaintiff alleges ViewRay's revenue projections for 2019 were misleading. (ECF No. 62, PageID #1856–57.)  Defendants contend the statements were forward-looking estimates accompanied by sufficiently specific and cautionary language, making them non-actionable under Section 10(b).  (ECF No. 59-1, PageID #1438–39.)

Plaintiff points to a March 14, 2019 press release in which ViewRay stated its 2019 revenue would be between $111 million and $124 million.  (ECF No. 62, PageID #1856 (citing ECF No. 55, ¶¶ 7, 90).)  Plaintiff maintains this statement is misleading because that "revenue was not achievable" and that the statement, although forward-looking, was not accompanied by the necessary meaningful cautionary language to bring it within the Reform Act's safe harbor.  (*Id.* at PageID #1856–57.)

This press release was an exhibit to ViewRay's Form 8-K for the period ending March 14, 2019.  (ECF No. 20-18, PageID #1680.)  This argument about the lack of cautionary language fails for at least two reasons.  First, the statement Plymouth points to begins with the phrase "ViewRay *anticipates* total revenue to be in the range of" before targeting the revenue.  (*Id.* at PageID #1683 (emphasis added).)  Second, the next page contains a disclosure regarding forward-looking statements that specifically states that "forward-looking statements include . . . ViewRay's financial guidance for the full year 2019" and that "actual results could differ from those projected in any forward-looking statements due to numerous factors."  (*Id.* at

24

PageID #1684.)  It then contains a non-exhaustive list of things that could impact those projections.

To the extent ViewRay's statements about anticipated revenue ultimately proved incorrect, basing a Section 10(b) claim on this fact fails because of the bespeaks-caution doctrine.  ViewRay's statements about its anticipated total revenue is forward-looking.  Also, meaningful cautionary language accompanied each statement.  Tellingly, Plaintiff omits this cautionary language from the second amended complaint.  (*See, e.g.*, ECF No. 55, ¶¶ 90, 100, PageID #1284 & 1287.)

Finally, Plaintiff argues its allegations do not amount to "fraud by hindsight" because the second amended complaint is based on "statements from confidential witnesses and media reports."  (ECF No. 62, PageID #1855–56 (citing ECF No. 55, ¶¶ 50–66, PageID #1272–77).)  But Plaintiff really complains that "the fact that something turned out badly must mean defendant knew earlier that it would turn out badly." *Louisiana Sch. Emp's Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010) (quoting *Konkol v. Diebold, Inc.*, 590 F.3d 390, 403 (6th Cir. 2009), *abrogated on other grounds by Matrixx*, 563 U.S. at 48–50).  For these reasons, Plaintiff's allegations about the company's 2019 revenue projections fail to state a claim.

### I.B.    Materiality

To be actionable, a misstatement or omission must also be material.  A "fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Basic*, 485 U.S. at 224 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  "[M]isrepresented or omitted

facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information available." *Omnicare III*, 769 F.3d at 472 (cleaned up).  But courts have a "limited understanding of investor behavior and the actual economic consequences of certain statements," which means they run the "risk [of] prematurely dismissing suits on the basis of [judicial] intuition." *Id.*

Neither party separately addresses the materiality of the statements that Plaintiff alleges ViewRay or its officers and directors made, so neither will the Court. For purposes of the present motion, then, the Court assumes that each statement or omission alleged is material.

### I.C.   Scienter

Scienter "is the lynchpin of most" Section 10(b) claims.  *Albert Fadem Trust v. American Elec. Power Co.*, 334 F. Supp. 2d 985, 1006 (S.D. Ohio 2004).  To allege it sufficiently, a plaintiff must demonstrate that each defendant "had a mental state embracing intent to deceive, manipulate or defraud."  *Omnicare III*, 769 F.3d at 472.

"[T]he Supreme Court set forth a three-part test used by lower courts to determine the sufficiency of a plaintiff's scienter allegations."  *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018) (citing *Tellabs*, 551 U.S. at 322). This inquiry requires lower courts to:  (1) "accept all factual allegations in the complaint as true"; (2) "consider the complaint in its entirety" to determine "whether all of the facts alleged, taken collectively, give rise to a *strong inference of scienter*"; and then (3) "take into account plausible opposing inferences" to decide whether "a reasonable person would deem the inference of scienter *cogent and at least as*

*compelling* as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322–24 (emphasis added).

To aid in this inquiry, and to determine if there is a "strong inference of scienter" that is "cogent and at least as compelling as any opposing inference," *id.*, the Sixth Circuit looks to "nine non-exhaustive factors," *Doshi*, 823 F.3d at 1039–40. They include whether there are allegations of:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Dougherty*, 905 F.3d at 979 (quoting *Omnicare III*, 769 F.3d at 473); *see Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc).

Although the Sixth Circuit's *en banc* decision in "*Helwig* is no longer good law" when it comes to the legal standard for scienter, its framework remains useful for analyzing factual allegations. *See, e.g.*, *Doshi*, 823 F.3d at 1039–43 (applying the factors); *Pittman v. Unum Grp.*, ___ F. App'x ___, ___, 2021 WL 2646065, at *3 (6th Cir. June 28, 2021) (same); *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, No. 3:16-cv-1106, 2019 WL 6251435, at *3 (N.D. Ohio Nov. 22, 2019) (same). At the same time, however, courts evaluate "scienter by looking at 'all the allegations holistically.'" *Pittman*, 2021 WL 2646065, at *3 (quoting *Tellabs*, 551 U.S. at 326).

27

In the end, scienter remains difficult to plead and hard to prove.  Compared to a run-of-the-mill civil action, a plaintiff alleging securities fraud must do "more— much more—"to survive a motion to dismiss.  *Albert Fadem*, 334 F. Supp. 2d at 1006. And although Rule 12(b)(6) requires that all inferences be drawn in the plaintiff's favor, "*inferences of scienter do not survive if they are merely actionable.*" *Id.* (emphasis in original) (quoting *Campbell v. Lexmark Intern. Inc.*, 234 F. Supp. 2d 680, 683 (E D. Ky. 2002)).  At this stage, a plaintiff's allegations about scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.  *See Tellabs*, 551 U.S. at 324.

### I.C.1. Scienter under the *Helwig* Factors

One way of demonstrating scienter is through a showing of recklessness—for example, that a company's directors or executives recklessly made statements to the market or recklessly omitted information from those statements.  Recklessness in this context means "highly unreasonable conduct which is an extreme departure from the standards of ordinary care . . . . akin to conscious disregard." *Dougherty*, 905 F.3d at 980.  The Supreme Court has not squarely addressed "whether recklessness suffices to fulfill the scienter requirement." *Matrixx*, 563 U.S. at 48.  Under the law of this Circuit, however, the requisite recklessness requires "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Doshi*, 823 F.3d at 1039 (quoting *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011)). "Before drawing an inference of recklessness, courts typically require multiple obvious red flags demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." *Id.* (citations and quotations omitted).

Plaintiff argues that, "[w]ith respect to misstatements or omissions of present fact, the requisite level of scienter is recklessness." (ECF No. 62, PageID #1857.)  In this respect, Plaintiff is correct.  Recklessness will satisfy the scienter requirement for misstatements or omissions of present fact.  With respect to forward-looking statements, however, recklessness does not suffice.  "Under the [Reform Act], if the alleged misstatement or omission is a 'forward-looking statement,' the required level of scienter is 'actual knowledge.'"  *Matrixx*, 563 U.S. at 48 n.14.  Additionally, "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute."  *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017–18 (11th Cir. 2004).

Plaintiff identifies six separate categories of allegations (which the Court groups into four) it says support scienter, several of which touch on *Helwig*'s factors, though others do not.  Plaintiff argues that:  (1)  there was a substantial divergence between internal reports and statements to the market; (2) the individual Defendants were "deeply involved" with setting the backlog and essentially disregarded the backlog's status when touting the company to investors, the backlog was a significant metric for the company, and the "sheer size of the invalid orders" supports scienter; (3) the individual Defendants had "clear motive and opportunity to commit fraud" as evidenced by "opportunistic" secondary offerings; and (4) the weakness of Defendants' "countervailing explanation" provides scienter.  (ECF No. 62, PageID #1857–64.)

### I.C.1.a.        Divergence from Internal Reports

Plaintiff argues that the second *Helwig* factor—a divergence between internal reports and external statements on the same subject—supports an inference of

scienter.  Plaintiff maintains that ViewRay and the other Defendants publicly told investors that the backlog amounted to $200 million in orders, while internal company records showed $48 million did not qualify as backlog.  (ECF No. 62, PageID #1857–58.)  To support this allegation, Plaintiff points to several paragraphs in the complaint.  (*Id.* (citing ECF No. 55, ¶¶ 54–55, 57–61, PageID #1273–75).)

In this context, internal reports and records receive broad construction.  *See Dougherty*, 905 F.3d 981.  The "contents of meetings at which senior corporate officers were present" count.  *Id.* (citing *City of Monroe*, 399 F.3d at 688).  So too would regulatory agency meeting minutes.  *Id.* (finding FDA End-of-Phase 2 meeting minutes qualify).  However, the mere existence of internal records and reports does not mean an inference of scienter necessarily follows.  To give rise to sufficient indicia of intent, there must be some divergence between those internal reports and the external statements the company makes on the same subject.  *Id.* (citing *Helwig*, 251 F.3d at 522).  What is relevant are not particular details about the reports themselves, but "the role of these reports in perpetuating" the alleged fraud and the "role of these reports in the Defendants' decision-making process."  *Konkol*, 590 F.3d at 398.  "The standard from *Tellabs* requires *specific* facts" that the "reports were known to Defendants" and that they reflect the allegedly fraudulent scheme.  *Id.* Confidential witnesses are one way to meet the *Tellabs* requirement.  *See id.*

### I.C.1.a.i.    Allegations

On  information  and  belief,  Plaintiff  alleges  that  ViewRay's  European distributors fronted money for down payments on MRIdian systems "where no end-user  agreement  had  been  signed"  and  that  ViewRay  nonetheless  included  these

orders in its backlog.  (ECF No. 55, ¶ 54, PageID #1273.)  In Paragraph 55, again based on information and belief, Plaintiff alleges that Defendants created "one or two additional orders for the backlog" before the end of fiscal reporting periods, such that these orders did not have "bona fide customers that had entered into contracts," and such sales "never materialized."  (*Id.* at ¶ 55.)  Plaintiff alleges this happened at least three times, in 2018 in the Benelux region and in 2019 in Italy and the Middle East.

Additionally, Plaintiff recounts information from Confidential Witness Two, a "senior official who worked with [ViewRay] toward the end of the class period."  (*Id.* at ¶ 56, PageID #1274.)  That individual believes that "certain orders derived from a third-party distributor in China . . . had been in the backlog for years."  (*Id.* at ¶ 61, PageID #1275.)  Further, this witness believes "that the distributor may have actually taken delivery of the units in question and warehoused them" but never delivered them to end users.  (*Id.*)  According to the confidential witness, at least one client and one university had indicated hesitancy about completing orders for MRIdian units.  (*Id.*, ¶¶ 59–60, PageID #1274–75.)  This confidential witness based his or her knowledge and belief on meetings involving domestic sales personnel and an area sales director.  (*Id.*, ¶¶ 56–58, PageID #1274.)

Elsewhere, Plaintiff alleges that Confidential Witness Three, a "senior employee" involved in "tracking and internal reporting on the backlog," recalled "formalized reports" about the "terms of each contract" and the "contract stage for each" machine, which were "distributed to" ViewRay's top executives and that the "CEO, COO, CFO, and sometimes Defendant Dempsey" would receive those reports

"on a bi-weekly basis." (*Id.*, ¶ 62–63, PageID #1275–76.) In addition, this witness recalls "a bi-weekly meeting" where those individuals discussed the report. (*Id.*) Further, the confidential witness remembers having conversations with "the COO on a daily basis" about "'what [the company] needed to do to get the unit in the ground'" and what it would take, on a "contract-by-contract basis" to get "each customer to accept delivery of the device." (*Id.*, ¶ 64, PageID #1276.)

*    *    *

These allegations fail to give rise to an inference of scienter for several reasons. Plaintiff alleges manipulation of the backlog through overseas distributors largely occurred in 2018. But the proposed class period runs from May 10, 2018, through January 13, 2020 (*id.* at ¶ 1, PageID #1253), and Confidential Witness Two only worked for ViewRay "toward the end of the class period" (*id.*, ¶ 56, PageID #1274). Nor does the second amended complaint allege that this witness has information about orders before then.

Assuming the truth of Plaintiff's allegations, throughout 2019 ViewRay told the market that it removed orders from its backlog: it removed one machine in 1Q18 (ECF No. 60-10, PageID #1601) and by year's end had removed four (ECF No. 60-16, PageID #1662). Instead of tending to support scienter, these allegations demonstrate that ViewRay followed through on what it told investors—that the company reviewed its backlog and removed orders it determined did not meet its criteria. In fact, Plaintiff's own calculations support the premise that ViewRay removed multiple orders from its backlog throughout FY19. (*See* ECF No. 55, ¶ 43, PageID #1269–70.) At an estimated $6 million per system, removing just eight units amounts to

32

removing $48 million from the backlog.  ViewRay told the market it removed four in that timeframe.

Plaintiff offers the competing inference that ViewRay had concrete negative information about the other four orders.  But no allegation in the second amended complaint supports this inference, and without supporting factual allegations it cannot raise an inference of scienter.  Plaintiff's allegations regarding the other confidential witnesses do not make this competing inference any more cogent.  Plaintiff alleges these individuals were company insiders familiar with how ViewRay operated.  But just because Plaintiff maintains Confidential Witness One said "it was possible" an end-user could back out of a purchase does not support an inference of scienter because Defendants warned the market of this possibility on multiple occasions.  For example, in its May 10, 2019 Form 10-Q, ViewRay stated that "[o]rders may be revised or cancelled according to their terms or upon mutual agreement between the parties" and "[t]herefore it is difficult to predict with certainty the amount of backlog that will ultimately result in revenue."  (ECF No. 60-9, PageID #1594–95.)  Again, in its FY18 10-K, ViewRay reiterated that "[t]here can be no assurance that backlog will result in revenue in any particular time period or at all." (ECF No. 16-20, PageID #1711.)  None of these allegations is sufficient to raise a strong inference of scienter.

### I.C.1.a.ii.  Authorities

The cases on which Plaintiff relies do not change this conclusion.  Principally, Plaintiff argues based on *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008), that "the existence of divergent data" can be so significant that there is no

way management could not be aware of it and that plausible scienter must follow. (ECF No. 62, PageID #1858.)  But in *Berson*, the facts alleged about the internal reports and the divergent information at issue differed materially from the facts alleged here.  There, the company's contracts with the federal government were subject to unilateral stop-work orders which, once activated, meant the government could statutorily and unilaterally cancel the contract.  *Id.* at 984.  This contract provision "heightened the risk that the company will never earn the money."  *Id.* Nonetheless, the company "continued to count the stopped work as part of its backlog *after* the stop work orders had been issued."  *See id.*  Ultimately, the Ninth Circuit determined that the allegations gave rise to a strong inference of scienter because the high-level executives "must have known about the orders because of their devastating effect on the corporation's revenue."  *Id.* at 987.

In contrast, the second amended complaint contains no allegations making this case like *Berson*.  At most, Plaintiff alleges a possibility that some customer with a contract might not end up purchasing an MRIdian system.  That allegation alone does not meet the standard *Tellabs* requires.  Instead, the competing inference—that ViewRay kept orders in the backlog that it thought would produce revenue, either from a customer directly or a distributor—is equally if not more cogent and compelling.

Plaintiff cites *In re Accuray Inc. Securities Litigation*, 757 F. Supp. 2d 936 (N.D. Cal. 2010) in a footnote—a case that appears more similar to this one.  (ECF No. 62, PageID #1859 n.4.)  There, the plaintiffs alleged that Accuray—which developed and

34

sold a single piece of expensive, complicated medical equipment—made false and misleading statements to the market regarding its backlog, which included "risky contingent contracts" that "did not have a substantial likelihood of resulting in future revenue[.]" *Accuray*, 757 F. Supp. 2d at 942. When Accuray's stock price fell after it revised an earnings target, the plaintiffs attempted to use this fact to show causation. Applying *Berson*, the court determined that Accuray's backlog constituted a "projection," not a "present figure that was falsely reported[.]" *Id.*

In attempting to plead scienter, the plaintiffs included statements from ten confidential witnesses. *Id.* at 939–40, 944–45. None sufficed. *See id.* On the backlog issue specifically, the court determined that no confidential witnesses offered "any facts regarding specific contracts that were included in the reported backlog[,]" alleged "that they were involved in determining which deals would be included[,]" or that they "had any communication with" the company's directors regarding the agreements. *Id.* at 944. Ultimately, the court determined that "[h]indsight and former opinions of former employees do not generally rise to the level of falsity" and that the case sounded more in "fraud by hindsight" than securities fraud, which runs contrary to the Reform Act. *Id.* at 945.

Here, Plaintiff makes arguments nearly identical to those asserted in *Accuray*, but with even less factual support. Like *Accuray*, these scienter allegations fall short of alleging Defendants acted with the knowledge, severe recklessness, or conscious disregard of multiple red flags required to maintain a Section 10(b) action.

### I.C.1.b.      Disregard of Current Information

Plaintiff also argues the sixth *Helwig* factor, a disregard for up-to-date factual information before making disclosures, supports a strong inference of scienter. Plaintiff maintains that (1) ViewRay's CEO and COO signed contracts and, therefore, knew which orders were not valid; and (2) its CEO or CFO directed that the backlog should include "sham orders" to "boost the backlog" at the end of each quarter and, therefore, when speaking to investors or signing SEC documents, Defendants Raanes and Bansal knew these orders did not belong in the backlog and disregarded that fact. (ECF No. 62, PageID #1858 (citing ECF No. 55, ¶¶ 24, 52, & 55, PageID #1260, 1273–74).) Plaintiff argues that it is "difficult to grasp" how the individual Defendants "could not have been aware" that the backlog was "invalid." (*Id.*, PageID #1859 (citing ECF No. 55, ¶¶ 63, 70, 73, & 87, PageID #1275–78, 1283–84).) Further, Plaintiff makes the same argument for an inference of scienter based on the importance of the backlog as a company metric (*id.*, PageID #1861–62 (citing ECF No. 55, ¶¶ 40, 87, PageID #1266, 1283–84)), and the magnitude of the backlog's invalid orders (*id.*, PageID #1862).

### I.C.1.b.i.     Allegations

Paragraph 24 of the second amended complaint outlines Defendant Raanes' duties as ViewRay's President and CEO between February 4, 2013, and July 22, 2018. (ECF No. 55, ¶ 24, PageID #1260.) Among other responsibilities, Mr. Raanes signed ViewRay's "order contracts, including international contracts with distributors that did not have customers[,]" "received reports from ViewRay employees" about the backlog, and "on information and belief" presided over ViewRay at a time when

"management solicited sham orders . . . to increase the size of" the backlog. (*Id.*, ¶ 24, PageID #1260–61.) Also, Plaintiff alleges that in another case Mr. Raanes "was alleged to have manipulated the backlog" of that company too. (*Id.*, ¶ 24, PageID #1261.)

Paragraphs 54 and 55 allege that, on information and belief, ViewRay's European distributors fronted money for down payments on MRIdian systems "where no end-user agreement had been signed," which ViewRay nonetheless included in its backlog and that Defendants created "one or two additional orders for the backlog" before the end of fiscal reporting periods, such that these orders did not have "bona fide customers that had entered into contracts," and such sales "never materialized." (*Id.* at ¶¶ 54–55, PageID #1273–74.) Paragraphs 63, 70, 73, and 87 allege that a confidential witness observed that the company issued bi-weekly reports about the backlog, and another confidential witness observed executives attending meetings regarding the same. (ECF No. 55, ¶ 63, PageID #1275–76.) Additionally, Plaintiff points to three additional facts as supporting a strong inference of scienter: (1) ViewRay issued a press release for its Form 8-K about the backlog's value (*id.*, ¶ 70, PageID #1277); (2) made a statement about the backlog review process in its Form 10-Q (*id.*, ¶ 73, PageID #1278); and (3) executives made comments about the backlog to investors at a conference in connection with fourth quarter figures (*id.*, ¶ 87, PageID #1283–84).

However, these allegations lack a connection between the information Defendants had—bi-weekly reports, meetings, and conversations that the

confidential witnesses say they were privy to—and any false statements or statements made with reckless disregard for the fact that the backlog included anything other than orders that had yet to turn into revenue.  Put another way, these allegations point back to Defendants' use of subjective criteria to evaluate the orders included in the backlog.  But Defendants continually reiterated the subjective nature of, and discretion given to, the decision about which orders to include or remove.  And while Plaintiff maintains there were a substantial number of invalid orders that should not have been included, the fact that Plaintiff may not have included one order or another in the backlog if it were at the helm does not give rise to a strong inference of scienter.

### I.C.1.b.ii.    Authorities

In addition to *Berson*, the parties debate various authorities to argue their respective positions on scienter based on the second amended complaint's allegations of disregard of current information.  Three merit discussion.

### (a)

In *Dougherty*, the plaintiffs alleged that the company made misleading statements regarding FDA approval of one of its drugs and sufficiently pled scienter based on conflicting information obtained from FDA meeting minutes that contradicted what the company said about the same events.  905 F.3d at 979.  According to the Sixth Circuit, the plaintiffs' "theory of scienter [was] straightforward":  after meeting with the FDA, the company announced "it would not need to complete [specific FDA certification] for approval of a drug it manufactured.  *Id*.  However, the published minutes from that FDA meeting told a different story,

38

and the company backtracked.  *Id.*  After the share price dropped, the plaintiffs argued the statements about approval were "recklessly false." *Id.* at 980.  Analyzing the scienter allegations, the court considered the *Helwig* factors, three of which cut in the favor of the plaintiffs:  a significant divergence between internal and external reports related to FDA approval, corporate disregard for the most current factual information before making statements, and a closeness in time between the fraudulent statement and the subsequent inconsistent disclosure.  *Id.* at 980–81.

**(b)**

In *City of Monroe Employees Retirement System*, the Sixth Circuit held that statements regarding the continuing safety of the defendants' tires gave rise to a strong inference of scienter.  399 F.3d at 684.  One defendant, the domestic subsidiary that manufactured and marketed the tires, made an unqualified statement that it "continually monitored the performance of all our tire lines" and that the "objective data clearly reinforced" its belief that the tires were "high-quality" and "safe."  *Id.* (cleaned up).  But there was a stark "contrast between the data known or available to Firestone" which, at the time it made the statement, specifically included "evidence of defective tires" demonstrated by "three years of a marked rise in the rates of deaths, injuries and claims and lawsuits based on several thousand rollover accidents, hundreds of injuries, and nearly 200 fatalities in the United States[.]"  *Id.* This information, contrasted with "the unqualified positive comments" the company leadership made, indicated awareness of these issues, making "the imputation of scienter reasonable."  *Id.* (going on to discuss facts that "reinforce[d]" that conclusion, including several other *Helwig* factors).

**(c)**

In *Konkol*, the plaintiffs alleged the defendant manipulated its revenue.  *Id.* at 395.  Basing their scienter argument on sales reports, the company's real-time accounting and sales data, and the individual defendants' access to information and attendance at meetings, the plaintiffs argued that scienter "could be inferred" from "the fact that [the d]efendants had access to and actually used detailed financial reports and real-time accounting software[.]  *Id.* at 397.  The Sixth Circuit disagreed and held that "fraudulent intent cannot be inferred from the Individual Defendants' positions in the Company and alleged access to information."  *Id.* (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004)).  "In the absence of greater particularity," the court had "no way of distinguishing the plaintiffs' allegations from the countless fishing expeditions which the [Reform Act] was designed to deter."  *Id.* (citation and quotation omitted).  Ultimately, the scienter allegations were inadequate because the plaintiffs merely alleged that the defendants "had access to [the company's] financial information" and lacked anything to demonstrate the defendants "knew of or recklessly disregarded the falsity of [the company's] earning statements and SEC certifications."  *Id.*

*     *     *

This case more closely resembles *Konkol* than *Dougherty* or *City of Monroe Employees Retirement System*.  Plaintiff's allegations about the individual Defendants' positions, general statements about their attendance at meetings and reviewing documents, and the dearth of relevant detail from the confidential witnesses connecting these documents to invalid orders that should have been

40

removed from the backlog based on the company's criteria fail to establish a strong inference of scienter.  The allegations of the second amended complaint fall short of the strong inference of scienter the Reform Act and *Tellabs* mandate, that Defendants knew or recklessly disregarded current financial information when they reported information to the market.

### I.C.1.c.        Motive and Opportunity to Commit Fraud

Based on the ninth *Helwig* factor, that Defendants had motive and opportunity to commit fraud to preserve their own salaries and positions, Plaintiff advances two arguments.

### I.C.1.c.i.      Stock Offerings

Plaintiff argues that ViewRay conducted two secondary stock offerings during the class period, one in August 2018 that raised $172.5 million and another in December 2019 that raised $149.6 million.  These offerings occurred at what Plaintiff maintains were significantly inflated share prices because of Defendants' misrepresentations about the backlog.  (ECF No. 62, PageID #1862–63.)  Without question, "self-interested motivation of defendants" can indicate scienter, especially where a company's leadership takes action to save "their salaries or jobs."  *Helwig*, 251 F.3d at 552.

For its argument, Plaintiff points to *Frank*, 646 F.3d at 962.  But the facts there bear little resemblance to those alleged here.  In *Frank*, the defendants "made false statements" about "positive projected earnings, the soundness of . . . accounting systems," and the company's "ability to continue to prosper in light of the rising cost of materials[.]"  *Id.* at 961.  Despite reporting "gangbuster earnings" and relying on

41

those false numbers to obtain loans, the company's industry "was spiraling toward bankruptcy," which permitted an inference of scienter, making company leadership appear even "more culpable" considering "the bonuses" its executives "stood to earn" based on incentives tied to earnings metrics. *Id.* at 962.

Plaintiff maintains that ViewRay's offerings provide evidence of the individual Defendants' scienter. But reporting inflated earnings to secure personal bonuses as in *Frank* at best bears only a tangential relationship to the facts alleged here. Plaintiff argues that because *the market valued* ViewRay at a certain price when it made secondary offerings based on allegedly inflated backlog metrics, Defendants committed an act of self-preservation and acted with the requisite scienter. (*See* ECF No. 62, PageID #1862–63.) Nowhere in the second amended complaint does Plaintiff allege, however, that any of ViewRay's executives had incentive pay or bonuses tied specifically to the outcome of those secondary offerings. As the Sixth Circuit noted, "[i]f a well-pleaded complaint can allege only that a corporation intended to defraud based on a desire to continue earning money, without showing a particular link between the actual statement and a specific payment, then the heightened pleading standard for scienter has no bite." *Omnicare III*, 769 F.3d at 484. At most, the facts alleged establish that the personal financial incentives of the individual Defendants aligned with those of shareholders, cutting against an inference of scienter.

### I.C.1.c.ii.    Defendant Dempsey's Stock Sales

The first *Helwig* factor indicates "insider trading at a suspicious time or in an unusual amount" as one indica of scienter. *Helwig*, 251 F.3d at 552. Plaintiffs argue in a footnote that Defendant Dempsey engaged in "insider stock sales" that are

"additional motive-and-opportunity evidence of scienter." (ECF No. 62, PageID #1863 n.5; *see also* ECF No. 55, ¶¶ 140(a)(i)–(iv), PageID #1301–02.)  Defendants argue Mr. Dempsey traded based on a Rule 10b5-1 trading plan, which "rebuts any inference of scienter" (ECF No. 59-1, PageID #1441), that his "Form 4s provide a more plausible, non-fraudulent inference"—that he traded "when his options were set to expire[,]" and that the second amended complaint "does not allege any stock sales by other Defendants or corporate insiders" (ECF No. 63, PageID #1891 n.13).

A trading plan under Rule 10b5-1 "is typically considered an affirmative defense used to determine when a person's purchase or sale is not 'on the basis of' material nonpublic information." *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 734 (S.D. Ohio 2006) (quoting 17 C.F.R. § 240.10b5-1).  Often, asserting a defense in response to a Rule 12 motion is premature.  *See id.*  Setting aside that procedural matter, as well as Plaintiff's assertion of the issue in a footnote, as a practical matter Mr. Dempsey sold ViewRay stock both before and after its share price fell, cutting against the notion that he somehow engaged in suspicious insider trading.

Defendants point to only one of those sales—the one after the share price fell—as evidence that the purchases are not indicative of scienter.  But the Court looks at all of Mr. Dempsey's transactions in assessing whether his trading is indicative of scienter.  The first sale pursuant to the trading plan was at Mr. Dempsey's earliest opportunity, when he acquired and disposed of 5,146 shares purchased at $.68 and sold at a weighted average price of $8.634 per share.  (ECF No. 60-24, PageID #1758.)

That same day, he acquired and then sold an additional 16,469 shares purchased for $0.68 and sold for a weighted average price of $8.6367 per share.  (ECF No. 60-24, PageID #1758.)  This option—his right to buy shares at a set price—was set to expire in June 2020.  (*Id.*)

Mr. Dempsey engaged in a second transaction pursuant to the plan on September 3, 2019, also at his earliest opportunity.  That day, he engaged in three acquisitions and dispositions:  (1) he bought 51,460 shares at a share price of $0.68 and sold for a weighted average price of $3.566 per share; (2) he bought 164,697 shares and sold at the same price; and (3) he bought 63,257 shares and sold for the same price.  (ECF No. 60-24, PageID #1760.)  Each of these three transactions proceeded according to a stock trading plan, with two of his options to buy expiring at the end of June 2020 and the third expiring in June 2022.  (*Id.*)  Mr. Dempsey acquired an additional 230,000 shares for $0.00 on October 24, 2019, subject to a grant that vested on that date, well-after this litigation was underway.  (*Id.* at PageID #1762.)

Although Mr. Dempsey had an opportunity to profit from these transactions, that fact alone does not give rise to a strong inference of scienter.  Mr. Dempsey engaged in pre-determined trades that took place at pre-determined times pursuant to a Rule 10b5-1 plan, which gave him the option to buy ViewRay stock at a set price and then sell it on the open market.  But no allegation in the second amended complaint suggests that these trades provide indicia of securities fraud.  To the contrary, an equally compelling inference, and a more cogent and compelling one than

Plaintiff puts forth, is that Mr. Dempsey exercised his options at his earliest opportunity.  Accordingly, these allegations and arguments fail to give rise to a strong inference of scienter on the part of Mr. Dempsey.

### I.C.1.d.        Countervailing Explanations

Plaintiff argues that "no plausible story has yet been told by the defendants that might dispel our incredulity" about their conduct.  (ECF No. 62, PageID #1863 (quoting *Tellabs*, 513 F.3d at 709).)  In doing so, Plaintiff emphasizes the 40% gap between ViewRay's backlog and its conversion to revenue—a gap it maintains persisted over time, dispelling any explanation other than securities fraud.  (*Id.*)  Beyond repeating the same sort of argument previously made (about the alleged disregard of current information), that the facts must support a strong inference of scienter, this claim falters on the shoals of the high standard for pleading scienter.  Even assuming the facts alleged in the second amended complaint support an inference of scienter, the Reform Act requires that such an inference must be "*cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322–24.  Plaintiff overlooks the equally compelling competing inference that the gap it identifies (crediting its calculations) owes to Defendants' application of the publicly stated backlog criteria.  That explanation has at least as much force as fraud for the losses of which Plaintiff complains.

### I.C.2. Holistic Analysis of Scienter

As the Supreme Court's decision in *Matrixx* requires, the Court also reviewed "all the allegations holistically." *Matrixx*, 563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 326).  Additionally, as courts within this Circuit continue to do following *Matrixx*,

45

the Court has also considered the allegations of the second amended complaint under *Helwig*. *See, e.g.*, *Dougherty*, 905 F.3d at 979 (applying *Helwig*); *Pittman*, ___ F. App'x at ___; 2021 WL 2646065, at *5 ("Our starting point is *Helwig*."). "A complaint adequately pleads scienter" under the Reform Act "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx*, 563 U.S. at 48 (quotation omitted). Taking all these considerations both individually and collectively, no reasonable person would deem Plaintiff's allegations of scienter "cogent and at least as compelling" as any opposing inference. Accordingly, the Court concludes that it must dismiss the second amended complaint.

Before concluding discussion of scienter and the alleged violations of the Exchange Act, however, the Court addresses two final issues.

### I.C.2.a.        Defendant Matin

To the extent the second amended complaint names Mr. Matin as a Defendant, it is woefully deficient in alleging he did anything, let alone that he violated the Exchange Act. In fact, the second amended complaint mentions his name only eleven times in total, five of which occur in the "Parties" section. His name only appears in connection with any substantive allegation where the second amended complaint states that Confidential Witness Two reported to him, among other senior executives. (ECF No. 55, ¶ 56, PageID #1274.) Otherwise, his name appears in statements by other ViewRay officers and directors. For these reasons, the second amended complaint fails to support any claim that Mr. Matin violated either Section 10(b) or Rule 10b-5.

### I.C.2.b.        The Other Individual Defendants

As for the other individual Defendants that Plaintiff names, Mr. Drake, Mr. Bansal, and Mr. Raanes, they were more intimately involved with the management of ViewRay. Moreover, the second amended complaint alleges they made statements to the market or signed SEC disclosure documents. But those activities do not amount to a cogent and compelling inference of scienter; therefore, any activity by any individual need not be discussed beyond what has already been said.

## II.    Section 20(a) Control Person Liability

To plead a violation of Section 20(a) for control person liability, a plaintiff must allege facts demonstrating that "the defendant 'controlled' another person who committed an underlying violation of the Act, and that the defendant 'culpably participated' in that underlying violation." *In re United Am. Healthcare Corp. Sec. Litig.*, No. 2:05-CV-72112, 2007 WL 313491, at *20 (E.D. Mich. Jan. 30, 2007) (quoting *D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 750 (E.D. Mich. 2003)); *see also Lubbers v. Flagstar Bancorp, Inc.*, 162 F. Supp. 3d 571, 584 (E.D. Mich. 2016). To maintain a Section 20(a) claim, then, a plaintiff must allege a primary violation of the Exchange Act. *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *20. Because Plaintiff fails to state a claim for a primary violation of Section 10(b) and Rule 10b-5, it cannot maintain its claim for control person liability.

### CONCLUSION

For the foregoing reasons, the Court determines the alleged misstatements and omissions on which Plaintiff relies are not actionable, even assuming their

materiality.    Additionally, taking Plaintiff's allegations holistically, the Court determines that the second amended complaint fails to give rise to a strong inference of scienter that is cogent and at least as compelling as any opposing inference.  In the end, Plaintiff attempts to turn a company's disappointing financial performance and stock drop into class action securities litigation of the sort the Reform Act attempts to curb.  Accordingly, the Court **GRANTS** Defendants' motion (ECF No. 59) and **DISMISSES** the second amended complaint (ECF No. 55) **WITH PREJUDICE**. The Court **DIRECTS** the Clerk to enter judgment accordingly.

>    **SO ORDERED.**

Dated:  August 25, 2021

_____

> J. Philip Calabrese
> United States District Judge
> Northern District of Ohio